TRANSNOR (BERMUDA) LIMITED, Plaintiff,

v.

BP NORTH AMERICA PETROLEUM, et al., Defendants.

No. 86 Civ. 1493 (WCC).

United States District Court, S.D. New York.

Aug. 5, 1987.

---

**582**

Tonachel Swan & Lewis, New York City, for plaintiff; Edward J. Swan, of counsel.

Sullivan & Cromwell, New York City, for defendant Exxon Corp.; Gandolfo V. DiBlasi, Michael Straus, of counsel.

Shea & Gould, New York City, for defendant BP Oil Intern., Ltd.; Bruce A. Hecker, Joseph Ferraro, of counsel.

Hertzog, Calamari & Gleason, New York City, for defendant Shell Oil Co.; Peter Calamari, of counsel.

Davis, Markel & Edwards, New York City, for Conoco Inc. and Conoco Ltd.; Gregory Markel, of counsel.

Cravath, Swaine & Moore, New York City, for defendants Shell U.K. Limited, Shell Intern. Trading Co., Royal Dutch Petroleum Co., and the "Shell" Transport and Trading Co., P.L.C.; John R. Hupper, Robin C. Landis, of counsel.

OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Defendants BP Oil International, Ltd., Conoco Inc., Shell Oil Company, Shell U.K. Ltd., Shell International Trading Co., Royal Dutch Petroleum Company, The "Shell" Transport and Trading Company, p.l.c., Conoco (U.K.) Ltd., and Exxon Corporation have moved to dismiss the complaint in this action on the grounds that (1) plaintiff lacks standing to assert its claims under the Sherman Act, 15 U.S.C. § 1 *et seq.* (1982), and under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (1986) (the "CEA"), and (2) this Court lacks subject matter jurisdiction over such claims. Defendant Shell International Trading Company ("SITCo") has also moved to dismiss the third claim, which is directed solely to it, on the ground that the Court lacks subject matter jurisdiction over that claim.

*Background*

Plaintiff Transnor (Bermuda) Ltd. is a corporation engaged in the business of trading crude oil. Transnor was established under the laws of Bermuda and has its principal place of business there. Defendants are companies (and their affiliates) engaged in the business of producing, refining and marketing crude oil and petroleum products.

For purposes of the motions to dismiss, the factual allegations in the complaint concerning the transactions at issue are taken as true. In December 1985, Transnor entered into contracts on the Brent Market to purchase two cargos of Brent blend crude oil (totalling 1.2 million barrels) at an average price of $24.50 per barrel. One of the contracts was made with defendant Shell International Trading Co. According to Transnor, the Brent Market is an American commodity futures market of a type defined by the CEA as a "board of trade" in that it operates largely in U.S. domestic commerce.

By mid-February 1986, the price of Brent blend crude oil declined by approximately $15 per barrel allegedly because of a conspiracy among defendants to manipulate the Brent market in order to establish trad-

ing prices at lower levels. The purpose of the alleged manipulation was to take advantage of certain provisions of the tax laws of the United Kingdom that affect defendants as producers of Brent blend crude oil and as European refiners.

According to Transnor, this conspiracy by defendants to depress the price of oil on the Brent Market violated section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Sections 4c, 6(b), and 9(b) of the Commodity Exchange Act, 7 U.S.C. §§ 6c, 9 and 13(b). Finally, Transnor has added a pendent common law cause of action claiming that defendant SITCo cheated Transnor in connection with these contracts on the Brent Market. Transnor alleges that it has sustained damages of approximately $87 million as a result of these illegal acts by defendants.

*Discussion*

Defendants maintain that Transnor lacks standing to assert its antitrust commodities claims. *In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court held that a plaintiff has standing to bring an antitrust claim when it suffers an

> "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. It should, in short, be the 'type of loss that the claimed violations' ... could be likely to cause."

*Id.*, 429 U.S. at 489, 97 S.Ct. at 697.

Among the injuries which the antitrust laws are clearly intended to remedy are injuries from price-fixing. Indeed, price fixing has been held to be so plainly anticompetitive and without redeeming value that it is a "per se" violation of the antitrust laws, precluding defendants from any attempt to justify their conduct by showing any procompetitive intent. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–223, 60 S.Ct. 811, 843–44, 84 L.Ed. 1129 (1940).

Defendants maintain, however, that this Court lacks subject matter jurisdiction and that plaintiff lacks standing to bring its antitrust claim since plaintiff is a foreign trader which purchased in London a commodity produced in the North Sea, in a market whose delivery point is the United Kingdom. According to defendants, since plaintiff and the transactions in issue have no nexus with the U.S., plaintiff is not protected by U.S. antitrust laws.

Plaintiff correctly points out, however, that the injury which it sustained was as the result of a purchase made on the Brent oil market which, according to plaintiff's affidavits, is primarily a U.S. market. Indeed, even if it were not strictly a U.S. market, there is no doubt that the Brent Market is part of U.S. commerce. According to affidavits submitted by plaintiff, two of the three principal trading centers of the Brent Market are in the United States (New York and Houston). Approximately 50% of the traders are in the United States and at least 50% of the brokers are in the U.S. Most of the foreign traders, brokers and producers maintain offices, agents or affiliates in the U.S. All trades on the Brent Market are denominated in U.S. dollars and measured in American barrels (not British "tonnes"). All dollar payments for Brent Market trades are cleared in New York. Further, Brent Market contracts can be used to fill contracts on the New York Mercantile Exchange.

The fact that Transnor is a foreign corporation which suffered its injury on a contract made, and calling for delivery, outside the U.S. does not deny it standing under the antitrust laws. To begin with, plaintiffs affidavits allege that, in trades on the Brent Market, only 5% of the purchasers ultimately take delivery of the oil. To prove this assertion, plaintiff notes that only 850,000 barrels of Brent Blend are produced each day, while over 17 million barrels are traded each day on the Brent Market. Thus, the delivery point for the oil is not a significant factor in determining the location of the Brent Market for purposes of standing and jurisdiction under U.S. law. Since 95% of the trades are evidently made for speculative or hedging purposes, the more significant factor is the

location of the trading market, not the production center or delivery point for the oil. Since two of the three principal trading centers for the Brent Market are in New York and Houston, U.S. law—and specifically U.S. antitrust and commodities law—must apply to causes of action arising from trades executed on the Brent market.

Despite these facts concerning the Brent market, defendants still maintain that plaintiff lacks standing under the antitrust laws since the contracts at issue were made by Transnor through the London branch of the Brent Market, and not in New York or Houston. Yet, in the legislative history of § 7 of the Sherman Act, Congress explicitly stated that a foreign plaintiff injured abroad has standing under U.S. antitrust law. The Report of the House Judiciary Committee states,

> This test ... [that conduct abroad have domestic effects] ..., however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct —e.g., price-fixing not limited to the export market—would affect all purchasers of the target products or services whether the purchaser is foreign or domestic. The conduct has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf., e.g., Pfizer Inc., et al v. Government of India*, et al, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).
>
> ....
>
> This ... does not however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States. As previously set forth, it is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States.

House Report No. 97–686, Leg.Hist.P.L. 97–290, 1982 U.S.Code Cong. and Adm. News, 2431 at pp. 2495–2497.

The fact that Transnor purchased the contracts at issue through the London branch of the Brent Market, rather than in New York or Houston, does not lessen Transnor's ability to vindicate Congress's clearly expressed desire that foreigners have standing to sue under the U.S. antitrust laws if the alleged course of anti-competitive conduct has the requisite impact on U.S. commerce.

In *Pfizer Inc. v. India, supra,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), the Supreme Court held that

> a foreign corporation is entitled to sue for treble damages, since the definition of 'person' contained in the Sherman and Clayton Acts explicitly includes 'corporations and associations existing under or authorized by ... the laws of any foreign country.' ... Moreover, the antitrust laws extend to trade 'with foreign nations' as well as among the several States of the Union. 15 U.S.C. §§ 1, 2 ... Clearly, therefore, Congress did not intend to make the treble-damages remedy available only to consumers in our own country. In addition, the petitioners' argument confuses the ultimate purposes of the antitrust laws with the question of who can invoke their remedies. The fact that Congress' foremost concern in passing the antitrust laws was the protection of Americans does not mean that it intended to deny foreigners a remedy when they are injured by antitrust violations. Treble-damages suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers.
>
> The Court has noted that § 4 has two purposes: to deter violators and deprive them of the 'fruits of their illegality,' and 'to compensate victims of antitrust violations for their injuries.' *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 [97 S.Ct. 2061, 2075, 52 L.Ed.2d 707]; *Brunswick Corp. v. Pueblo Bowl-O Mat, Inc.,* 429 U.S. 477, 485–86 [97 S.Ct. 690, 695–96, 50 L.Ed.2d 701]; *Perma Life Mufflers, Inc. v. International Parts Corp., supra,* [392 U.S. 134] at 139 [88 S.Ct. 1981 at 1984, 20 L.Ed.2d 982]. To deny a foreign plaintiff injured by an antitrust violation the right to sue would defeat these purposes. It would permit a price fixer or a monopolist to escape liability for his il-

legal actions and would deny compensation to his victims, merely because he happens to deal with foreign customers. *Pfizer*, 434 U.S. at 313–315, 98 S.Ct. at 588–589. Thus, the Supreme Court expressly held that the foreign victim of a "price fixer" has standing to assert antitrust claims.

Finally, defendants' reliance on the decision in *de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510 (S.D.N.Y. 1985) is misplaced. In *de Atucha*, Judge Lasker dismissed the antitrust claims of an Argentine silver trader who alleged that he suffered losses on the London Metals Exchange (the "LME"). The Argentine plaintiff had alleged that certain defendants located in the U.S. had manipulated the U.S. silver markets and that, because the domestic and London silver markets "function from an economic standpoint as a single market" (*id.* at 512), the London silver market collapsed, causing plaintiff substantial losses on his long positions on the LME. Judge Lasker concluded, however, that such an alleged causal relationship between the two markets was "too speculative and indirect" to support an antitrust claim. Id. at 516. Judge Lasker clearly noted that "the first prerequisite to a determination that a plaintiff was injured in "the relevant Market is a finding that the market is part of American foreign or domestic commerce." *Id.* at 518. Since "the antitrust laws do not extend to protect foreign Markets from anticompetitive effects," (*Id.* at 518 *quoting Platt Saco Lowell Ltd. v. Spindelfabrik Suessen-Schurr*, 1978–1 Trade Cases, (CCH) ¶ 61,898, at 73,775 (N.D.Ill.1977)), and since de Atucha suffered his injury on the LME, he lacked standing under the U.S. antitrust laws.

Here, however, plaintiff has suffered its injury on the Brent Market which, according to the affidavits presented by plaintiff, is an international market whose trading locations and traders are primarily in the U.S. Accordingly, unlike de Atucha, plaintiff's injury was not "entirely outside of United States commerce." *de Atucha* at 518. Rather, the injury was in an international market which is centered in the U.S.

 For the same reasons that Transnor has standing under the U.S. antitrust laws, it also has standing under U.S. commodities laws. Since the Brent Market is essentially a U.S. market, according to plaintiff's unrefuted affidavits, the commodities laws of the U.S. apply to transactions on that market. Further, based on the allegations in the complaint and the accompanying affidavits, there is little question that the contracts at issue here were futures contracts, and that plaintiff never intended to take delivery of the oil.

*Conclusion*

For the reasons outlined above, plaintiff has standing under the U.S. antitrust and commodities laws, and this Court has subject matter jurisdiction over the claims. Accordingly, the motions to dismiss are denied.

So ordered.