### In re COPPER ANTITRUST LITIGATION.

**Metallgesellschaft AG and MGTS UK Holding Ltd., Plaintiffs,**

v.

**Sumitomo Corporation, Sumitomo Corporation Of America, Yasuo Hamanaka, Global Minerals and Metals Corporation, Inc., R. David Campbell and Carl D. Alm, Defendants.**

No. MDL 1303.
No. 00–C–0040–C.

United States District Court,
W.D. Wisconsin.

Oct. 2, 2000.

---

Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handl, New York, NY, for Metallgesellschaft AG, MGTS UK Holding Ltd.

David R. Cross, Quarles & Brady, Milwaukee, WI, of Sumitomo Corp. of America.

Yasuo Hamanaka, Tokyo, Japan, pro se.

H. Peter Haveles, Jr., Cadwalader, Wickersham & Taft, New York, NY, for Carl D. Alm, R. David Campbell, Global Minerals and Metals Corp.

Celia Barenholtz, Kronish Lieb Wiener & Hellman LLP, New York, NY, for Sumitomo Corp.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary, declarative and injunctive relief brought pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 2; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1341, 1343 and 1962; N.Y. Gen. Bus. Law § 340; and the common law of fraud. Plaintiffs Metallgesellschaft AG and mgts UK Holding Ltd. contend that defendants Sumitomo Corporation, Sumitomo Corporation of America, Yasuo Hamanaka, Global Minerals and Metals Corporation, R. David Campbell and Carl D. Alm violated state and federal laws by entering into a conspiracy to raise the price of copper to artificially high levels through manipulation of the London Metal Exchange. Presently before the court is a motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) and the doctrine of *forum non conveniens* by all defendants except Yasuo Hamanaka. These defendants contend that jurisdiction over this case does not exist under the Sherman Act or RICO because plaintiffs are foreign corporations who were injured in the United Kingdom by defendants' manipulation of

the LME (the London Metal Exchange). They contend also that the case should be dismissed on *forum non conveniens* grounds, that state antitrust statutes do not apply to predominantly foreign conduct because enforcement of such statutes is barred by the commerce clause and that the fraud-on-the-market theory of recovery does not apply to plaintiffs.

In arguing subject matter jurisdiction, both sides look to 15 U.S.C. § 6a, the Foreign Trade Antitrust Improvement Act of 1982, which sets out the conditions under which the provisions of the Sherman Act will apply to conduct involving trade or commerce with foreign nations. I conclude that it is plain from the language of this act and bolstered by the legislative history that a private plaintiff cannot sue under the antitrust laws of the United States for injuries incurred as a result of international transactions that have an anticompetitive effect on a United States market if the domestic anticompetitive effect is not the same one that gives rise to the plaintiff's injury. Accordingly, I will grant defendants' motion to dismiss for lack of subject matter jurisdiction over plaintiffs' antitrust claims. Plaintiffs have not argued that there is any basis for subject matter jurisdiction over their RICO claims if jurisdiction does not exist over their antitrust claims. Therefore, I will grant defendants' motion to dismiss this claim as well. The Sherman Act and RICO claims are the only federal law claims asserted; I decline to exercise jurisdiction over the remaining state law claims.

For the sole purpose of deciding this motion, I find that plaintiffs' complaint fairly alleges the following.

## ALLEGATIONS OF FACT

### I. PARTIES

Plaintiff Metallgesellschaft AG is a corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business in Frankfurt. It brings this action in its capacity as the assignee of the claims and causes of action against defendants of its subsidiary MG Metals & Commodity Corp., a corporation organized and existing under the laws of Delaware, with its principal place of business in New York City. The claims and causes of action possessed by MG Metals & Commodity Corp. also include claims and causes of action possessed by Metal Concentrates International, Inc., a corporation formerly organized under Delaware law that had its principal place of business in New York City. At all relevant times, Metal Concentrates International, Inc. was in the business of buying and selling copper concentrates. (Copper concentrates are copper-ore bearing material extracted from copper mines, which is then sold to copper smelters, where it is refined by means of an electrolytic process into a highly pure grade of copper known as copper cathode.) Metal Concentrates' business included the purchase of large amounts of copper warrants and copper futures contracts on the London Metal Exchange and other futures markets.

Plaintiff mgts UK Holding Ltd. is a wholly-owned subsidiary of plaintiff Metallgesellschaft, organized and existing under the laws of the United Kingdom, with its principal place of business in London. Plaintiff mgts UK Holding Ltd. brings this action in its capacity as the assignee of claims and causes of action against defendants of its subsidiary MG Metals & Commodity Co. Ltd., a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London. At all relevant times, MG Metals & Commodity Co. Ltd. was a copper merchant in the business of buying and selling copper cathode, a product sold generally to end users, such as manufacturers of copper wire, tubing, cable, rod and other applications. MG Metals & Commodity Co. Ltd.'s business included the purchase of large amounts of copper warrants and copper futures contracts on

the London Metal Exchange and other futures markets.

Defendant Sumitomo Corporation is a foreign corporation that regularly transacts business in New York City. Sumitomo Corporation of America is a domestic corporation that regularly transacts and at all relevant times has transacted business in New York City. Both corporations maintain offices in New York City. (I will refer to these defendants collectively as Sumitomo.) At all relevant times, Sumitomo was one of the world's largest buyers and sellers of copper. Its business included extensive trading on the LME and other futures markets. At all relevant times, defendant Yasuo Hamanaka was head of the Copper Metals Section of Sumitomo's Non–Ferrous Metals Department, where he was the person primarily responsible for the purchase and sale of physical copper, hedging those transactions with copper future contracts, and otherwise trading copper warrants and copper futures contracts.

Defendant Global Minerals and Metals Corporation is a corporation organized and existing under the laws of Delaware. It maintains its principal offices in New York City. Global is a copper merchant firm that was formed in 1993. As a result of its conspiracy with Sumitomo, it became one of the most profitable copper trading companies in the world. Defendant R. David Campbell resides and maintains his place of business in New York state. As a principal of Global, he was involved in the conspiracy engaged in by Sumitomo and Global. Defendant Carl D. Alm resides and maintains his place of business in New York state. As Global's chief copper trader, Alm performed acts designed to cause an artificial inflation in copper prices and copper spread price differentials so as to advance the conspiracy among defendants.

## II.  THE COPPER AND COPPER FUTURES MARKETS

Copper is a non-ferrous metal used in the manufacture of pipe, wire, tubing, rods and other applications, usually in the highly purified form of copper cathode. Copper futures contracts are standardized agreements for the purchase and sale of a fixed quantity of copper cathode, for delivery at a specified time in the future, at a price agreed upon when the contract is made. Merchants and traders in the United States and elsewhere use copper futures contracts for the purpose of either speculating on the direction of copper prices or hedging against other business they may have. More than 95% of the world's copper futures contracts are traded on the LME, which is the primary exchange for merchants and traders in the United States and elsewhere to trade copper futures. The other major copper futures exchange is the Comex division of the New York Mercantile Exchange based in New York City.

The standardized LME futures contract requires that copper deliveries be made to or taken from an LME-designated warehouse, which is where copper deliverable to the LME is stored. Dozens of such LME warehouses exist around the world. One of the largest is in Long Beach, California, where almost all of the LME copper deliverable in the United States was stored during the relevant time. There are also six other LME warehouses in the United States, where smaller quantities were stored. Copper stored in LME warehouses is traded in the form of copper warrants.

By conspiring, defendants were able to corner the market for copper available for immediate delivery on the LME, driving up the price that short position holders had to pay for long positions to cover their short contracts as they came due or that others had to pay to acquire warrants and short term futures contracts. Thus, for example, the price for copper available for immediate delivery rose from about $1,700 a metric ton in 1994 to more than $3,000 a metric ton in 1995.

Defendants were able to reap huge profits because they held extraordinarily large long positions that they could sell, lend or roll over at a profit. At the same time, merchants and traders on the other side of these transactions were being "squeezed," meaning that they incurred huge losses because they had to pay artificially inflated prices to close out or roll over their positions.

## III. THE CONSPIRACY

The conspiracy began at least as early as 1994, when Sumitomo and Global agreed to act in concert to buy up copper available for delivery on the LME and thereby drive up the price for such copper. In the fall of 1995, the United States Commodity Futures Trading Commission launched an investigation into Sumitomo's trading activities following a complaint from the Comex that artificially high prices on the LME were occurring because copper was being removed from Comex warehouses in Arizona and shipped to the LME warehouse in Long Beach. Sumitomo denied any wrongdoing.

On or about May 9, 1996, Sumitomo removed Hamanaka from his position as general manager of the non-ferrous metals department and assigned him to a position as assistant to the general manager of the non-ferrous metals division. After Sumitomo's announcement of Hamanaka's reassignment, the LME cash price for copper declined from about $2,800 a metric ton to below $2,000 a metric ton. On May 11, 1998, the CFTC found that during 1995 and 1996, Hamanaka "engaged in a scheme, in conjunction with an entity operating in the United States, with the intent of manipulating the price of copper." The commission found that "Sumitomo, acting through its agent or agents, established and maintained large and dominating futures positions in copper metal on the [LME]" and that Sumitomo "acquired a dominant and controlling cash and futures market positions, [sic] which directly and predictably caused copper prices, including prices on the United States cash and futures markets, to reach artificially high levels." The CFTC fined Sumitomo $150 million.

On May 20, 1999, the CFTC began an enforcement action against Global, Campbell and Alm.

## IV. EFFECTS ON COMMERCE IN THE UNITED STATES

By artificially driving up copper prices on the LME, where 95% of the world's copper futures are traded, defendants directly affected the prices paid for such copper by merchants and traders in the United States. One of the most important methods by which defendants sought to carry out their scheme was by buying up all of the copper stocks in the LME's warehouses, including the LME warehouse in Long Beach, California, where approximately 25% of the LME's worldwide stocks were stored, and in other LME warehouses in the United States. Defendants' acts drove up the price for deliverable copper on the LME, thereby producing an adverse effect on American copper merchants and traders that had to purchase such copper. Defendants' conduct caused the pricing of physical copper and copper products throughout the United States cash market to be artificially inflated and distorted.

Although the LME is headquartered in London, it is an international market with substantial contacts with the United States. American merchants and traders trade on the LME, frequently through United States investment banks. All of the major investment banks in the United States offer LME copper futures contracts to their American clients and more than a dozen American companies offer real-time price quotes from the LME on a 24–hour basis to their American subscribers. The nexus between the LME and the United States is reflected by the fact that (1) since 1993, all LME copper futures have been traded in United States dollars; (2) the LME accepts delivery of copper from all

the major American copper producers; (3) the LME has several warehouses in the United States designated specifically for the delivery of copper; and (4) a large part of the futures contracts traded on the LME provide for delivery at one or another of the LME warehouses in the United States.

## V.  INJURY

In order to hedge against copper price volatility, MG Metals & Commodity Co. Ltd. purchased LME short positions to cover the price risk on copper cathodes it was acquiring and long positions to cover the price risk on cathodes it was selling. For most of the relevant period, MG Metals & Commodity Co. Ltd. was a net short seller on the LME; its near term short positions almost always exceeded its near-term long positions at any given time.  As a net short-seller, MG Metals & Commodity Co. Ltd. suffered substantial damages as a result of defendants' having created an artificially inflated and backwardated market whose purpose and effect was to squeeze short sellers.  Had the market not been backwardated artificially, MG Metals & Commodity Co. Ltd.'s net short position would have generated significant profits, all of which were lost because of defendants' conduct.  MG Metals & Commodity Co. Ltd. also incurred substantial finance costs in having to borrow money to cover the cost of closing out its short positions. From time to time, rather than borrow money, MG Metals & Commodity Co. Ltd. was forced to cover its short positions by tendering to the LME warehouse warrants or copper cathodes that it had purchased previously at a premium for resale for its customers.  When this happened, MG Metals & Commodity Co. Ltd. forfeited the premium it had paid to acquire the stocks.

Like MG Metals & Commodity Co. Ltd., Metal Concentrates International, Inc. was generally a net short-seller of LME copper futures contracts and incurred substantial losses when it was forced to close out or roll over its positions in an artificially inflated and backwardated market.

## VI.  FACTS FOUND FROM AFFIDAVITS

From affidavits submitted by the parties, I find the following facts.

The London Metal Exchange is a United Kingdom corporation with its offices and trading facilities located exclusively in London.  Almost all LME brokers that are permitted to trade with non-member clients are located in London;  the one exception is located in Australia.  As a result, every LME futures contract has at least one party in London.  All LME client contracts must be "matched" by the LME broker in London with another LME broker in London and must be cleared through the London Clearing House in London, which is a United Kingdom corporation regulated under the U.K. Financial Services Act of 1986.  LME trading is conducted according to English law.  Under LME rules, every contract between client and broker is expressly governed by English law and is subject to arbitration in England.  LME brokers and the LME itself are licensed and regulated under British law.

Most LME trading does not take place on its trading floor in London, but instead occurs over the telephone in the offices of brokers and dealers authorized by the LME to write LME contracts.  The existence of "interoffice trading," which takes place in offices around the world, in addition to the "open outcry" system of trading that takes place on the floor of the exchange, has turned the LME into a 24–hour market.  New York City is one of three centers for the "interoffice trading" of LME contracts in the world, the other two being London and Tokyo.  Between 1994 and 1996, almost all of the LME ring dealing members marketed and sold LME contracts from offices in the New York metropolitan area.  All brokers and dealers who write LME contracts for sale in the United States are subject to United States regulatory oversight and must com-

ply with the Commodity Exchange Act. During 1994 and 1996, most copper traded in the United States was traded on the LME.

## OPINION

### I. MOTION TO DISMISS STANDARD

Defendants' main challenge to plaintiffs' complaint is the alleged lack of subject matter jurisdiction. They attack subject matter jurisdiction in fact, rather than on the *face of the pleading*, and have filed several affidavits containing jurisdictional facts in support of their motion.

"[S]ubject matter jurisdiction deals with the power of the court to hear the plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 at 135 (2000 Supp.). Plaintiff has the burden of proving subject matter jurisdiction. "In addition, the pleading will be read as a whole with any relevant specific allegations found in the body of the complaint taking precedence over the formal jurisdictional allegation, and with all uncontroverted factual allegations being accepted as true." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 at 219–20 (2d ed.1990). " 'The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.' " *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir.1999) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) (per curiam)).

### II. SUBJECT MATTER JURISDICTION OVER SHERMAN ACT CLAIMS

#### A. *Antitrust Laws and International Trade*

The Sherman Act, 15 U.S.C. §§ 1–7, applies to trade with foreign nations as well as to domestic interstate commerce. It does not apply to all aspects of international trade; Congress lacks the power to criminalize behavior that has no consequences within the United States. There must be a jurisdictional nexus between the anticompetitive conduct and commerce within the United States. *See United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416, 443 (2d Cir.1945):

> We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States. On the other hand, it is settled law ... that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends .... [citations omitted].

*See also Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1291–92 (3d Cir.1979) (*Alcoa* established that Sherman Act was intended to reach conduct having consequences within this country if conduct is intended to and actually does have effects upon United States imports or exports).

This case concerns the nature and adequacy of the requisite jurisdictional nexus. Defendants contend that subject matter jurisdiction exists over private antitrust claims only if those claims arise out of an allegedly anticompetitive effect on a United States market. They argue that in this case, American courts have no subject matter jurisdiction over plaintiffs' claims because plaintiffs' injury arose out of the effects of defendants' allegedly anticompetitive conduct on the LME and not out of the effects of that conduct on the Comex and cash markets for copper in the United States. Plaintiffs contend that jurisdiction exists whenever there is an injury arising out of alleged anticompetitive conduct, so long as the conduct has a direct, substantial, and reasonably foreseeable effect in

the United States regardless whether the injury arose from the same effects. If plaintiffs are correct, American antitrust laws apply to plaintiffs' claims for damages arising out of injuries incurred as a result of defendants' allegedly anticompetitive conduct because that conduct affected American markets, albeit only secondarily.

Both sides look to the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a, in support of their positions. This act represents a congressional effort to clarify the application of antitrust laws to foreign trading and to promote export of American goods and services by exempting export trade companies, methods and activities from United States antitrust restrictions. See H.R.Rep. No. 97–637, part I, at 9 (1982), reprinted in 1982 U.S.C.C.A.N. 2431, 2431–32. The act was intended to "address [the] problems of perception and definition [of the proper test for determining the existence of United States antitrust jurisdiction over international transactions] by clarifying the Sherman Act and the antitrust proscriptions of the Federal Trade Commission Act to make explicit their application only to conduct having a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce or domestic exports." H.R.Rep. No. 97–686, at 2, reprinted in 1982 U.S.C.C.A.N. 2487, 2487.

The wording of the Foreign Trade Antitrust Improvement Act, 15 U.S.C. § 6a, is central to the parties' argument. Therefore, I will set it out in full.

Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

[Proviso] If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

The term 'commerce ... with foreign nations' "generally refers to transactions in which a foreign seller deals with an American purchaser, or vice versa ...." IA Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 273, p. 383 (1997). Because plaintiffs challenge conduct that involves trade or commerce on the LME, a foreign market, they must satisfy either subsection (1)(A) or (1)(B) and subsection 2 of section 6a in order to establish that American antitrust laws apply. Cf. McGlinchy v. Shell Chemical Co., 845 F.2d 802, 815 (9th Cir.1988) (dismissing Sherman Act claims because plaintiffs alleged injury only to customers in Southeast Asia and to themselves; plaintiffs failed to satisfy subsection 1(A) because they did not allege a direct effect on domestic commerce, that is, "trade or commerce which is not trade or commerce with foreign nations," or import trade and they failed to satisfy subsection 2 because they did not allege antitrust injury to market or to competition in general, that is, that allegedly anti-competitive conduct did not give rise to claim under Sherman Act).

Plaintiffs' allegations make out a claim that defendants' actions had a sufficiently direct, substantial and foreseeable effect on United States commerce to fall within subsection 1(A). For now, I will conclude that plaintiffs have met the requirements of subsection 1. See Cpt., dkt. # 5, ¶ 45 (Commodity Futures Trading Commission found that Sumitomo "acquired a dominant and controlling cash and futures market positions, which directly and predictably

caused copper prices, including prices on the United States cash and futures markets, to reach artificially high levels"); Cpt. ¶ 47 (inflation of the LME price for deliverable copper had direct effect upon American copper merchants and traders who had to purchase such copper); Cpt. ¶ 48 (inflation of LME price caused inflation on Comex and inflation of prices for physical copper and copper products throughout United States). This leaves the question whether plaintiffs' claims come within subsection 2 of § 6a.

## B. *Foreign Trade Antitrust Improvement Act*

■ Section 6a applies domestic antitrust law to anticompetitive conduct only if (1) "such conduct has a direct, substantial, and reasonably foreseeable *effect*" on domestic trade or commerce, on import trade and on the export trade of persons in the United States and (2) "*such effect* gives rise to a" Sherman Act claim. (Emphasis added.) The most natural way of reading this language is that antitrust laws do not apply unless the *effects* are the same. In other words, the Sherman Act claim that a plaintiff alleges and the Sherman Act claim that arises out of the effect on an American market must be the same.

■ Plaintiffs' reading is that "*a*" claim means only that there must be *some* claim that arises, whether or not it is the claim that the plaintiff is asserting. I find this reading unpersuasive. It does not acknowledge either the language of the act, which is explicit in stating that it is the *effect* of the conduct that is the focus of Congress's concern, the congressional purpose in enacting the legislation, which was to clarify the antitrust laws "to make explicit their application only to conduct having a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce or domestic exports," *see* H.R.Rep. No. 97–686, at 2, or the comity concerns that would be implicated by expanding the reach of American antitrust law to remedy anticompetitive effects on a foreign market such as the LME. (It is one thing to apply domestic antitrust laws to anticompetitive conduct that affects a United States market; it is another to apply them to anticompetitive conduct that affects a futures market located in and regulated by another country and causes injuries that do not occur in the United States.)

Plaintiffs argue that what seems the natural reading of § 6a is erroneous, for two reasons. First, they believe that the plain language of the statute makes clear that it was not intended to change the law that subject matter jurisdiction turns solely on the existence of the requisite effects in the United States, not on the relationship of plaintiffs' injury to those effects. Second, plaintiffs read § 6a as distinguishing between conduct that affects export commerce and conduct that affects other commerce and as making jurisdiction turn on the relationship of the plaintiffs' injury to the effects on a United States market only when the effects giving rise to jurisdiction involve export trade.

### 1. *State of law before 1982*

Plaintiffs argue that it was well settled before the enactment of § 6a that subject matter jurisdiction did not depend on the "same effects" test, but they cite no case law to support this claim. So far as can be determined, the issue never came up. In the reported cases, the courts had no occasion to address the same effects requirement because in each case, the plaintiffs' injuries arose out of the same effects experienced by the markets. *See, e.g., Industrial Investment Development Corp. v. Mitsui & Co., Ltd.,* 671 F.2d 876, 881 (5th Cir.1982) (jurisdiction existed over claim by American companies that defendants conspired to keep them out of business of harvesting trees in Indonesia and exporting logs to United States; effect on United States market and American exporters was same); *Mannington Mills, Inc.,* 595 F.2d at 1290 (jurisdiction existed over claims by American company that another American company had secured foreign patents by fraud and used patents to re-

strict plaintiff and other American competitors from engaging in export trade); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 601 (9th Cir.1976) (jurisdiction existed over claims that defendants controlled export of Honduran lumber with intent to interfere with export of such lumber into United States for plaintiffs' use or sale); *Alcoa*, 148 F.2d at 444 (Sherman Act applies to extraterritorial conduct that is intended to affect United States market and does affect it; thus, it applied to action against corporation that organized European cartel to restrict aluminum imports into United States; plaintiffs alleged their injuries were incurred as result of monopolization of import market).

All that can be said about the common understanding of the law in 1982 was that jurisdiction over foreign anticompetitive conduct existed only where that conduct had intended effects on a United States market. It was an open question whether it was necessary only to show *some* effect or whether a plaintiff would have to show that the effect was the same as the effect giving rise to the plaintiff's claim.

### 2. *Statutory language*

Starting with the language of § 6a's proviso ("If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States"), plaintiffs argue that the limitation on jurisdiction comes into play only in cases involving exports:

> ... this [proviso] denies jurisdiction when (a) the restraint only affects exports and (b) the plaintiff is an importer in another nation harmed by the illegal conduct. But this limitation on jurisdiction even when direct, substantial, and reasonably foreseeable effects otherwise exist[ ] comes into play *only* by "operation of paragraph 1(B)"—that is, in cases involving restraints on exports. By its terms, it is inapplicable when, as here, the effects giving rise to jurisdic-

tion are those covered by paragraph 1(A) and involve effects on U.S. domestic commerce.

Plts.' Br., dkt. # 63, at 26. Plaintiffs add that reading into subsection 2 a restriction similar to the proviso would render the proviso entirely superfluous, in violation of the principle of statutory construction that statutes should be read so as to give effect to every part.

Defendants have the better argument. They maintain that subsection 2 of § 6a addresses the location of the plaintiff's *injury*, that is, whether in a domestic or foreign market, whereas the proviso addresses the location of the *plaintiff*. The proviso merely "imposes the further restriction that only a U.S. exporter, and not a foreign importer of U.S. goods, may bring suit for alleged antitrust violations affecting a U.S. export market, even if the foreign importer otherwise satisfies the statute's two-part test." Defs.' Reply Mem., dkt. # 73, at 10. In fact, plaintiffs' reading of the statute would render subsection 2 superfluous. It is clear that the proviso is intended to limit the class of persons who may bring suit under the laws of the United States for antitrust violations involving export trade. That class consists only of persons engaged in the export business in the United States. No such limitation on the location of the victim is intended or imposed in the remainder of the statute, which affords remedies to persons located anywhere in the world who are injured by the effects of anticompetitive conduct, provided that the conduct has an effect on the domestic market of the United States.

### C. *Legislative History*

As I have explained, I view the language of § 6a as clear. It imposes a "same effects" requirement as a prerequisite to subject matter jurisdiction. Therefore, there is no need to resort to legislative history to disentangle the meaning of the statute. However, a review of the parties' use of the legislative history sheds light on the discussion of the statute's meaning and

adds support to what I believe is the obvious reading of the statutory language. Plaintiffs cite H.R.Rep. No. 97–686 at 5, *reprinted in* 1982 U.S.C.C.A.N. 2487, 2495, in which the drafters of § 6a noted Congress's intent to exempt from the antitrust laws conduct that does not have the requisite effects but not to exclude all foreigners from recovery or all foreigners injured abroad. Conduct in the United States, such as price fixing not limited to exports, would affect everyone who purchased the product or service in this country or overseas. *See id.* The drafters added that there was good reason to allow foreign persons to sue under United States laws "when the conduct in question has a substantial nexus to this country"; doing so would eliminate the possibility that defendants would continue to violate the antitrust laws if they thought they would be liable only to injured domestic persons. *Id.*

Nothing in this history suggests that Congress intended that the scope of recovery would extend to persons injured overseas by effects other than those felt by American markets. Instead, the history indicates that Congress wanted to allow persons injured abroad to sue for damages if they are injured as a result of anticompetitive effects on an American market. That proposition is not disputed. Plaintiffs would read this legislative history as evidence of congressional intent that it is *conduct* that should be looked to rather than effects; if the foreigner is injured abroad by the same conduct, he should be able to sue in an American court even if he was injured by different effects of the same conduct. Attributing such intent to Congress in the absence of explicit language to that effect is questionable for all the reasons explained previously and in light of the additional excerpts from the legislative history cited by defendants.

For example, defendants cite the following paragraph from the House Reports. The Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace. Consistent with this conclusion, *the full Committee added language to the Sherman and FTC Act amendments to require that the "effect" providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws.* This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States. As previously set forth, it is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States, or, in the case of conduct lacking such an impact, on an export opportunity of a person doing business in the United States.

*Id.* at 11–12, *reprinted in* 1982 U.S.C.C.A.N. at 2496–97 (emphasis added). In my view, this paragraph supports defendants' reading of the statute.

### D. *Case Law*

Plaintiffs cite a number of cases that they contend are supportive of their position, but none of them is on point. For example, plaintiffs cite *Caribbean Broadcasting System v. Cable & Wireless,* 148 F.3d 1080, 1086 (D.C.Cir.1998), for the proposition that in cases brought under section 1(A), "the location of the [injured] supplier[ ] is not relevant to whether the plaintiff has alleged an effect upon U.S. domestic or import commerce." Plaintiffs' citation of this case suggests a misunderstanding of defendants' position. Defendants do not dispute the assertion that Congress intended to preserve Sherman Act jurisdiction for a foreign person injured by conduct that causes the requisite effects in the United States, even if that person suffers economic injury abroad, so long as the overseas injury is the result of effects on an American market. If persons conspire to fix prices in a way intend-

ed· to affect an American market, the domestic antitrust laws will apply to a suit by a person injured by the price-fixing even if the person is located overseas. On the other hand, the antitrust laws do not apply to an action by a person injured overseas because of price-fixing in a foreign market even if the same defendants engage in price-fixing affecting an American market.

In *Caribbean Broadcasting*, the alleged injury was to advertisers in the United States. Furthermore, when the court discussed the statute, it quoted sections 1(A) and 1(B) and mentioned the proviso, while ignoring subsection 2, the meaning of which is at issue here. *See id.* at 1085. This omission suggests that the court did not believe the subsection had any application to the situation; alternatively, the parties may not have raised the question.

Plaintiffs cite *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Again, this case is unlike plaintiffs'. In *Hartford*, the defendants were alleged to have conspired to affect the market for insurance in the United States and plaintiffs' injuries arose from the effects on the American market. In this case, plaintiffs allege that defendants intended to drive up the price of copper futures on a foreign futures exchange.

In *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C. 1987), the district court interpreted the statute to bar a foreign corporation from recovering for an injury suffered outside the United States. A French corporation that distributed imported Hanes outerwear to retailers in France argued that the conspiratorial conduct injured American exporters, having sufficient effect on American export trade to satisfy the Foreign Trade Antitrust Improvement Act. *See id.* at 499. The court disagreed, stating,

> [p]laintiff in the instant case, not being within the class of United States export manufacturers allegedly injured by defendants' conduct, seeks to piggyback onto the alleged injury of United States

exporters. The Export Act, however, requires an actual injury to plaintiff within the United States—a requirement plaintiff clearly has not satisfied.

*Id.* at 500. The court did not discuss whether it was basing its conclusion on subsection 2 or on the proviso, stating only that "[a] foreign company that demonstrates the requisite effect on the United States export trade, but fails to establish that it is within the class of injured United States exporters, lacks a jurisdictional basis to sue under the Sherman Act." *Id. 'In' Porters* is distinguishable from this case because the conduct in question had an effect on export trade, making both subsection 2 *and* the proviso applicable.

Finally, plaintiffs cite *Transnor (Bermuda) Ltd. v. BP North American Petroleum (Transnor I)*, 666 F.Supp. 581 (S.D.N.Y. 1987), in which the court found subject matter jurisdiction over antitrust claims brought by a plaintiff who had suffered injury on a contract purchased in London. Defendants' alleged anticompetitive conduct depressed the price of oil on the Brent Market on which plaintiff traded. The significant difference between *Transnor I* and this case is that the court found that the Brent Market was "an American commodity futures market of a type defined by the [Commodity Exchange Act] as a 'board of trade' because it operates largely in U.S. domestic commerce." *Id.* at 582. Among other things, two of the three Brent Market's trading markets were in the United States and 88 of 109 traders and brokers active in the Brent Market had offices in the United States. No such finding could be made about the LME.

### E. *Plaintiffs' Alternative Arguments*

Plaintiffs contend that it is not necessary to decide whether subject matter jurisdiction requires the same effects because the LME is a United States market, plaintiffs' subsidiaries were injured doing business in the United States and some of defendants' conduct occurred here. Plain-

tiffs rely on *Transnor I*, 666 F.Supp. 581, in which the court found that the Brent Market (a market for futures and hedging contracts for North Sea oil) was a United States market despite its substantial foreign ties. The Brent Market stands in contrast to the London Metal Exchange, whose only branch is in London and whose brokers are all located outside the United States.

As in *Transnor I*, 666 F.Supp. at 583–84, in which the court held that the location of oil production areas and delivery points was of little relevance in determining whether a market was a United States market or not, the location of LME warehouses is not important in determining whether the LME is an American market. Neither the fact that American merchants and traders may trade on the LME through American investment banks that go through official LME brokers in London nor the fact that the LME accepts delivery of copper from all major American copper producers makes the LME an American market. The critical factors are that the LME is located in London and all but one of its brokers have offices in England.

There is no substance to plaintiffs' claims that jurisdiction exists because its subsidiaries were injured doing business in the United States. Plaintiffs were injured by artificial inflation and backwardation on the LME. That same inflation caused Comex futures prices and the cash prices of physical copper to rise in the United States, but it was not those effects that injured plaintiffs. The only damages plaintiffs allege they have suffered came from losses suffered because of defendants' squeezing of short sellers on the LME. The unalleged fact that plaintiffs' assignors may have covered their short positions by tendering to LME warehouses in the United States warrants or copper cathodes that they had purchased at a premium for resale to customers does not mean that any injury to these entities was incurred in the United States.

For the same reason, it is irrelevant that some of defendants' conduct took place in the United States. It was not the conduct in the United States that caused plaintiffs' injuries.

### F. *Summary*

The logical interpretation of the language of § 6a is that Congress extends domestic jurisdiction to extraterritorial conduct only when the plaintiffs have been injured by the effects on the domestic market. This is consistent with the main purpose of the Foreign Trade Antitrust Improvements Act, which was to protect American exporters from liability under the Sherman Act where the exporters were operating abroad. Congress believed that American exporters were at a disadvantage in foreign markets because of their fear that they would be subjected to liability in the United States for engaging in the kind of anticompetitive acts that were necessary to be competitive in those markets. It is not reasonable to think that Congress wanted to provide a forum for mostly foreign plaintiffs who were injured abroad by effects felt abroad and not in American markets, even if the wrongdoer's conduct produced other anticompetitive effects in the United States. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction will be granted.

### G. *Standing*

Throughout their brief, plaintiffs have emphasized the distinction between standing and subject matter jurisdiction. They argue that the only issue before the court is whether the court has subject matter jurisdiction over their action and that this determination requires nothing more than finding that plaintiffs have alleged that defendants' anticompetitive conduct had effects on a United States market. According to plaintiffs, whether they were injured by the same effects is a question of standing and not subject matter jurisdiction; defendants have not argued that plaintiffs lack standing; therefore, the court need not reach the question.

At least one court has distinguished the concepts in deciding jurisdiction under § 6a. *See Transnor (Bermuda) v. BP North America Petroleum (Transnor II),* 738 F.Supp. 1472, 1476 (S.D.N.Y.1990) (in deciding whether foreign company can sue under United States antitrust laws for anticompetitive conduct intended to cause decline in price of oil, "[t]his Court carefully attempts to distinguish those cases dealing with standing from those interpreting subject matter jurisdiction"). However, § 6a discusses jurisdiction in terms of both an effect on an American market and an effect giving rise to a claim under the antitrust laws. From my reading of the statutory language and the legislative history, I am convinced that the effects in subsections 1 and 2 must be the same. In other words, the Sherman Act does not apply to a suit by a person injured overseas by an effect in a foreign market. Unless the injury arises out of an effect on an American market, there is no jurisdictional nexus that allows the United States to apply its laws to extraterritorial conduct.

Although I see this question as one of subject matter jurisdiction rather than standing, the question of standing cannot be ignored even if defendants do not raise it. Standing is critical to the existence of a justiciable case or controversy. Plaintiffs' only legally protected interest under the Sherman Act is the private cause of action granted by § 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 provides a federal cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." It allows successful plaintiffs to recover triple damages, costs and attorney fees. In order to establish the fact of injury, a party attempting to proceed under § 15 would have to show more than that *a* claim arose out of an effect experienced by an American market, which is what plaintiffs assert is all that is necessary for subject matter jurisdiction. Such a party would have to show that *it* was injured by the effects on the American market. Unless it could do that, the court could not entertain its case.

Plaintiffs were not injured by the domestic effect of defendants' conduct. Therefore, they would be unable to utilize § 4 of the Clayton Act to bring a suit against defendants under the Sherman Act.

## III. OTHER CLAIMS

It appears that the parties agree that subject matter jurisdiction over the RICO acts is coextensive with jurisdiction under the Sherman Act. The cases they cite do not state this specifically but neither side has suggested that this court might have jurisdiction over the RICO claims even though it does not have jurisdiction over the Sherman Act claims, or vice versa. "Arguments that are not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999); *see also Finance Investment Co. (Bermuda) Ltd. v. Geberit AG,* 165 F.3d 526, 528 (7th Cir.1998); *Colburn v. Trustees of Indiana University,* 973 F.2d 581, 593 (7th Cir. 1992) ("[plaintiffs] cannot leave it to this court to scour the record in search of factual or legal support for this claim"); *Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board,* 957 F.2d 302, 305 (7th Cir.1992) (court has "no obligation to consider an issue that is merely raised, but not developed, in a party's brief"). Therefore, I will dismiss plaintiffs' RICO claims on the same grounds as the Sherman Act claims were dismissed. Because this court does not have subject matter jurisdiction over any of plaintiffs' federal claims, I will decline to exercise supplemental jurisdiction over their state law antitrust and common law fraud claims.

## IV. YASUO HAMANAKA

Defendant Yasuo Hamanaka did not file a motion to dismiss the complaint as to

him. Despite his failure to defend, there is no reason to allow the suit to continue against him now that I have determined that this court lacks subject matter jurisdiction over plaintiffs' claims.

## ORDER

IT IS ORDERED that the motion of defendants Sumitomo Corporation, Sumitomo Corporation of America, Global Minerals and Metals Corporation, R. David Campbell and Carl Alm to dismiss the complaint against them for lack of subject matter jurisdiction is GRANTED. FURTHER, IT IS ORDERED that the complaint against defendant Yasuo Hamanaka is dismissed on the court's own motion for lack of subject matter jurisdiction. The clerk of court is directed to enter judgment for defendants and close the case.