Revised February 26, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-20763
_____


DEN NORSKE STATS OLJESELSKAP AS,

Plaintiff-Appellant,


versus

HEEREMAC VOF; HEERMA MARINE CONTRACTORS;
HEEREMA OFFSHORE SERVICES US, INC.;
HEEREMA OFFSHORE CONSTRUCTION GROUP, INC.;
JAN MEEK; PIETER HEEREMA; McDERMOTT
INTERNATIONAL, INC.; McDERMOTT, INC.;
J. RAY McDERMOTT, SA; J. RAY McDERMOTT,
INC.; J. RAY McDERMOTT GULF CONTRACTORS,
INC.; McDERMOTT ENGINEERS & CONSTRUCTORS
(USA), INC.; McDERMOTT ENGINEERING HOUSTON
LLC; McDERMOTT-ETPM, INC.; SAIPEM SPA;
SAIPEM INTERNATIONAL BV; SAIPEM UK LIMITED;
SAIPEM (PORTUGAL) - COMERCIO MARITIMO,
SOCIEDADE UNIPESSOAL, SA,

Defendants-Appellees.
_____

Appeal from the United States District Court for the
Southern District of Texas
_____

February 5, 2001

Before JOLLY, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal requires us to interpret the scope of the United States antitrust laws and their application to foreign conduct. The plaintiff is a Norwegian oil corporation that conducts business solely in the North Sea. It seeks redress under the United States antitrust laws against the defendants for an alleged anticompetitive conspiracy that supposedly inflated the plaintiff's operating costs in the North Sea. Supreme Court precedent makes clear as a general proposition that United States antitrust laws "do not regulate the competitive conditions of other nations' economies," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582, 106 S.Ct. 1348 (1986). More specifically, today we are bound by the plain language of the Foreign Trade Antitrust Improvements Act (FTAIA). Thus, even though the plaintiff alleges that the antitrust conspiracy raised prices in the United States, it fails to assert jurisdiction under the antitrust laws because the plaintiff's injury did not arise from that domestic anticompetitive effect. Accordingly, we find that the district court properly dismissed the plaintiff's antitrust claims for lack of subject matter jurisdiction. It follows that we affirm the court's determination that the plaintiff lacked antitrust standing to bring these claims in United States federal court.

I

We begin with the basics. Sections 1 and 2 of the Sherman Act prohibit restraints of trade and monopolization. Section 1 reads:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1. Section 2 of the Sherman Act states:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . .

15 U.S.C. § 2. The FTAIA, enacted by Congress in 1982 to clarify the application of United States antitrust laws to foreign conduct, limits the application of such laws when non-import foreign commerce is involved. The FTAIA states that the antitrust laws will not apply to non-import commerce with foreign nations unless the conduct at issue has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce <u>and</u> "such effect gives rise to a claim under" the antitrust laws.[1]

---

[1]15 U.S.C. § 6a. In full, the FTAIA reads:

> Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless–
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect–
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in

The plaintiff, Den Norske Stats Oljeselskap As ("Statoil"), is a Norwegian oil company that owns and operates oil and gas drilling platforms exclusively in the North Sea. The defendants are providers of heavy-lift barge services in the Gulf of Mexico, the North Sea, and the Far East. Only six or seven heavy-lift barges exist in the world. These immense vessels have cranes capable of hoisting and transporting offshore oil platforms and decks weighing in excess of 4,000 tons. During the 1993-1997 time frame, which is at issue in this suit, the three defendants controlled these barges.[2] Between 1993 and 1997, Statoil purchased heavy lift barge services from the HeereMac and Saipem defendants in the North Sea.

Statoil alleges that the defendants conspired to fix bids and allocate customers, territories, and projects between 1993 and

_____

the United States; and
(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
[Proviso] If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

[2]The first group of defendants, HeereMac v.o.f. and its subsidiaries, a foreign corporation with its principal place of business in The Netherlands, controlled four or five of the barges. Saipem S.p.A., a British company, controlled one heavy-lift barge. McDermott, Inc., an American corporation, apparently controlled the last barge.

1997.  Under the alleged arrangement, the defendants agreed that HeereMac and McDermott would have exclusive access to heavy-lift projects in the Gulf of Mexico, while Saipem would receive a higher allocation of North Sea projects in exchange for staying out of the Gulf.  The defendants also allegedly agreed to submit embellished bids on heavy-lift projects.  As a result of this conspiracy, Statoil contends that it paid inflated prices for heavy-lift barge services in the North Sea.[3]  Statoil further argues that the conspiracy compelled it to charge higher prices for the crude oil it exported to the United States.[4]  Finally, Statoil asserts that purchasers of heavy-lift services in the Gulf of Mexico were forced to pay inflated prices for those services because of the conspiracy.[5]

## III

By way of background, it should be noted that in December 1997, the United States Department of Justice filed a criminal

---

[3]Statoil does not allege that it purchased any heavy-lift services in the United States or that the contracts it entered into included agreements to apply United States law.

[4]Statoil asserts that it has exported an average of 400,000 barrels of oil a day into the United States over the past three years.  Statoil does not, however, allege any injury to itself derived from its export of oil to the United States.

[5]Statoil does not allege that it owns, operates, or commissions any oil exploration platforms within United States waters, or that it conducted business with any of the defendants incorporated in the United States.

complaint against defendants HeereMac and Jan Meek, one of HeereMac's managing directors. The complaint alleged that the defendants conspired "to suppress and eliminate competition by rigging bids for the sale of heavy-lift derrick barge and related marine construction services in the United States and elsewhere."[6] HeereMac and Meek submitted to United States jurisdiction and pled guilty to the charges. They agreed to pay fines of $49 million and $100,000, respectively.

Following the guilty pleas, numerous companies across the globe filed suit in United States federal court seeking redress for injuries stemming from defendants' conduct. The first of these suits was filed in the Southern District of Texas in June 1998 by Phillips Petroleum Company and three of its foreign-based subsidiaries.[7]

On January 22, 1999, the court dismissed Phillips's claims for injuries sustained by its foreign subsidiaries relating to projects in foreign waters but allowed those claims asserting injury from projects in United States waters to proceed. While the court acknowledged the worldwide nature of the alleged conspiracy in its

---

[6]The plea agreement separately addressed issues related to commerce affected by defendants' conduct in the Gulf of Mexico and commerce affected by defendants' activity in the North Sea and Far East.

[7]A group of about forty plaintiffs brought a second suit against defendants in the Northern District of Texas.

order, it nonetheless held that subject matter jurisdiction did not exist for those claims pled by foreign-based subsidiaries for injuries allegedly sustained on foreign platforms.[8]  Specifically, the court determined that those claims did not fall within the ambit of the United States antitrust laws because the claims did not arise from a direct and substantial effect on United States commerce.[9]

Statoil filed this suit in the same court in December 1998. The court dismissed Statoil's complaint against the defendants on July 12, 1999.[10]  In its order, the court relied heavily upon its decision in the Phillips case and found no subject matter jurisdiction over the claims because "Statoil's damages arise from its projects in the Norwegian sector of the North Sea";  thus, the FTAIA's requirement that the effect on domestic commerce "gives rise" to the antitrust claim was not satisfied.  See 15 U.S.C.

---

[8]The court determined it did have subject matter jurisdiction over the alleged conspiracy and injury "relating to the Mahogany project in the territorial waters of the United States in the Gulf of Mexico."

[9]The court stated that "the claims of the foreign-based [subsidiaries] regarding injuries sustained in relation to the foreign platforms" were not justiciable in United States courts because "the primary injury to that party must be caused in the United States and substantially affect United States commerce."

[10]The defendants filed motions to dismiss based on lack of subject matter jurisdiction (Rule 12(b)(1)) and failure to state a claim under the Sherman Act (Rule 12(b)(6)).

7

§ 6a(2).  The court also held that the defendants' conspiracy "did not have a direct, substantial, and reasonably foreseeable anticompetitive effect on United States trade or commerce" under the FTAIA.  See 15 U.S.C. § 6a(1).  Finally, the court determined that "Statoil lacks standing to bring a claim under United States antitrust laws because its alleged injuries are not of the type that the antitrust statute was intended to redress."[11]  Statoil timely appealed the judgment.

IV

The issue presented to us is primarily one of statutory interpretation.  Specifically, this appeal requires us to interpret the relevant provisions of the FTAIA to determine whether the defendants' conduct and Statoil's injury in the North Sea presents a justiciable claim in the federal courts of the United States.

It is not helpful that the federal courts have generally disagreed as to the extraterritorial reach of the antitrust laws and have employed assorted tests to determine the scope of the Sherman Act.  The history of this body of case law is confusing and unsettled.[12]  However, as far as this appeal is concerned, our work

---

[11]The court then declined to exercise supplemental jurisdiction over the remaining common law claims pursuant to 28 U.S.C. § 1367(c)(3).

[12]The first case to consider the extraterritorial application of United States antitrust law was American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511 (1909).  In that case,

8

is simplified by Congress' passage in 1982 of the FTAIA, which specifically exempts certain foreign conduct from the antitrust laws. This circuit has never interpreted the relevant portions of the FTAIA as they apply to global conspiracies and resulting

---

Justice Holmes announced that the Sherman Act could have no application to conduct that occurred outside of the United States. Id. at 357. However, as the United States became increasingly involved in foreign commerce in the years following American Banana, the Supreme Court relaxed its previous stance and held that the Sherman Act authorized jurisdiction over foreign defendants so long as domestic commerce was affected and some conduct occurred within the United States  See United States v. Sisal Sales Corp., 274 U.S. 268, 276, 47 S.Ct. 592 (1927).

In 1945, the Second Circuit laid the groundwork for what became known as the "effects test" to determine antitrust jurisdiction over foreign conduct. In United States v. Alumnium Company of America ("Alcoa"), 148 F.2d 416 (2d Cir. 1945), Judge Learned Hand determined that a United States court would have jurisdiction over the conduct of foreign corporations where that conduct was intended to, and actually did, affect United States commerce. Id. at 443-44. The Alcoa effects test has been gradually adopted by most federal courts, albeit in various forms.

The already confused effects test was even more imprecise following the Ninth Circuit's decision in Timberland Lumber Co. v. Bank of America, 549 F.2d 597, 613 (9th Cir. 1976). In that case, the court introduced a balancing test that considered principles of comity in addition to domestic effects when determining the scope of antitrust jurisdiction over foreign defendants. The Fifth Circuit adopted a similar comity-informed approach. See American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n, 701 F.2d 408, 413 (5th Cir. 1983). Most recently, in 1993, the Supreme Court confirmed that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." Hartford Fire Ins. Co. v. California, 509 U.S. 769, 796, 113 S.Ct. 2891 (1993).

9

foreign injury.[13]  Today, we take on this task, and make no claim that it is an easy one.

V

A

We review de novo a district court's ruling on a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[14]  See Hebert v. United States, 53 F.3d 720, 722 (5th Cir. 1995).  In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  See Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).  Nevertheless, we must accept all factual allegations in the plaintiff's complaint as true.  See Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).

---

[13]In fact, no circuit appears to have interpreted the critical portion of the FTAIA at issue in this case--the requirement that the domestic effect on commerce "gives rise" to the antitrust claim.  15 U.S.C. § 6a(2).

[14]It is true that the defendants filed 12(b)(6) motions along with their 12(b)(1) motions.  However, the district court's order establishes that the court dismissed the claims for lack of subject matter jurisdiction rather than failure to state a claim under the antitrust laws:

> [T]he court orders that Defendants' motions to dismiss for lack of subject matter jurisdiction are granted and that this case is dismissed without prejudice.  All remaining pending motions are moot.

We first outline Statoil's argument that United States antitrust jurisdiction encompasses the conduct and injury in its complaint.

B

Statoil argues that the FTAIA does not preclude the district court's jurisdiction over its antitrust claims. Specifically, Statoil argues that the FTAIA was enacted exclusively to ensure that the conduct providing the basis of the plaintiff's claim have the requisite domestic effects, and was not intended to preclude recovery to foreign plaintiffs based on the situs of the injury.[15] Moreover, Statoil contends that Section 2 of the FTAIA was inserted only to ensure that the effect on United States commerce that provides jurisdiction is itself a violation of the antitrust laws; that is, the statute simply requires that there be some

---

[15]Statoil refers to the legislative history of the FTAIA to support its interpretation:

> The Committee did not believe that the bill reported by the subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace. Consistent with this conclusion, the full committee added language to the Sherman and FTC Act amendments to require that the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States.

H.R. Rep. No. 97-686, at 12.

11

anticompetitive, <u>harmful</u> effect in this country--not just a positive or neutral domestic effect.[16]

Addressing specifically the FTAIA's requirement that the domestic effect "gives rise" to its antitrust claim, Statoil primarily argues that, because the defendants operating in the Gulf of Mexico were able to maintain their monopolistic pricing only because of their overall market allocation scheme (which included agreements regarding operations in the North Sea), Statoil's injury in the North Sea was a "necessary prerequisite to" and was "the quid pro quo for" the injury suffered in the United States domestic market. Statoil alleges that the market for heavy-lift services in the world is a single, unified, global market; therefore, because the United States is a part of this worldwide market, the effect of

---

[16]Statoil cites additional legislative history in support of this interpretation of the FTAIA:

> . . . [T]he domestic 'effect' that may serve as the predicate for antitrust jurisdiction under the bill must be of the type that the antitrust laws prohibit. For example, a plaintiff would not be able to establish United States antitrust jurisdiction merely by proving a beneficial effect within the United States, such as increased profitability of some other company or increased domestic employment, when the plaintiff's damage claim is based on an extraterritorial effect on him of a different kind.

H.R. Rep. No. 97-686, at 12 (1982) (citation omitted).

12

the conspiracy, whether in the United States or in the North Sea, "gives rise" to any claim that is based upon this conspiracy.[17]

C

We must disagree with Statoil's arguments based on our reading of the antitrust statutes. Although we are controlled by the plain language of the statutes, we also find that the legislative history of the FTAIA and applicable case law supports our determination that the district court lacked jurisdiction over Statoil's claims.

We begin with an analysis of the relevant statutes and the plain language contained therein.

1

The Supreme Court has explained that "[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive." Escondido Mut. Water Co. v. La Jolla Indians, 466 U.S. 765, 772, 104 S.Ct. 2105 (1984). We are thus bound by the plain, ordinary meaning of

---

[17]In addition to its statutory interpretation arguments, Statoil cites a number of cases in an attempt to support its proposition that subject matter jurisdiction exists under the Sherman Act so long as the conspiratorial conduct had an affect on United States commerce. See Caribbean Broad. Sys., Ltd. v. Cable and Wireless PLC, 148 F.3d 1080 (D.C. Cir. 1998); United States v. Nippon Paper Indus. Co., 109 F.3d 1 (1st Cir. 1997); Hartford Fire, 509 U.S. 764; Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 98 S.Ct. 584 (1978). However, none of these cases interpret the relevant provision of the FTAIA (15 U.S.C. § 6a(2)) and, therefore, none of these cases inform our inquiry into the proper interpretation of the "gives rise to" requirement.

13

the language used in the antitrust statutes and, in particular, the FTAIA.

We begin by first noting that the Sherman Act itself applies only to conduct in "trade or commerce <u>with</u> foreign nations." 15 U.S.C. §§ 1,2 (emphasis added). The commerce that gives rise to the action here--the contracting for heavy lift barge services in the North Sea--was not United States commerce <u>with</u> foreign nations, but commerce <u>between</u> or <u>among</u> foreign nations--that is, between or among Statoil (a Norwegian corporation), Saipem (England), and HeereMac (The Netherlands). Therefore, we doubt that foreign commercial transactions between foreign entities in foreign waters is conduct cognizable by federal courts under the Sherman Act.[18]

As we have noted, the FTAIA states that the antitrust laws will not apply to non-import foreign conduct unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and (2) such effect

---

[18]This interpretation is further strengthened by the limits placed on Congressional power in the Constitution. Article I, § 8 of the Constitution gives Congress the authority only to regulate interstate commerce and "commerce <u>with</u> foreign nations" (emphasis added). Thus, even if Congress indeed intended to regulate purely foreign commerce in the Sherman Act, it was not empowered to do so under the Commerce Clause.

14

gives rise to the antitrust claim.[19]  The conduct of these defendants is foreign conduct that falls within the general parameters of the FTAIA and, thus, Statoil must show that the two

---

[19]The dissent, like Statoil, argues that Section 2 should be read to require only that the domestic effect give rise to <u>any</u> antitrust claim, not necessarily the plaintiff's claim.  This interpretation contradicts the explicit intent of Congress to require that the effect must give rise to the particular injury claimed by the plaintiff in the suit:

> . . . [T]he full committee added language to the Sherman and FTC Act amendments to require that the 'effect' providing the jurisdictional nexus <u>must also be the basis for the injury alleged under the antitrust laws</u>.

H.R. Rep. No. 97-686, at 12 (emphasis added).
  The dissent asserts that reading Section 2 as requiring that the domestic effect give rise to the plaintiff's claim renders the FTAIA's proviso redundant.  Although giving the statute a clear understanding is difficult, we disagree with the dissent's reading.  We read Section 1(B) to provide that the export commerce covered under the exception must be conducted by a person who is engaged in that export business in the United States.  Section 2 provides that the defendant's antitrust effect on this export commerce described in Section 1(B) must give rise to the plaintiff's cause of action.  The proviso, in turn, states that the recovery for injuries resulting from the conduct described in Section 1(B), which gives rise to the plaintiff's antitrust claim in Section 2, is limited to injuries occurring in the United States.  Therefore, we fail to see the redundancy to which the dissent refers.  <u>See</u> <u>In re Copper Antitrust Litigation v. Sumitomo Corp.</u>, No. 00-C-0040-C, 2000 WL 1521587, at *10 (W.D. Wis. Oct. 2, 2000) (holding that "[t]he logical interpretation of the language of § 6a is that Congress extends domestic jurisdiction to extraterritorial conduct only when the plaintiffs have been injured by the effects on the domestic market.").

specific requirements of the statute are met to establish subject matter jurisdiction over its claims.[20]

We accept the contention that Statoil has sufficiently alleged that the defendants' conduct––that is, the agreement among heavy-lift service providers to divide territory, rig bids, and fix prices––had a direct, substantial, and reasonably foreseeable effect on the United States market. Statoil alleges that the conspiracy not only forced purchasers of heavy-lift services in the Gulf of Mexico to pay inflated prices, but also that the agreement compelled Americans to pay supra-competitive prices for oil.[21] These allegations are sufficient to satisfy the first requirement of the FTAIA.

However, Statoil fails to show that this effect on United States commerce in any way "gives rise" to its antitrust claim.[22]

---

[20]Specifically, Statoil's claim falls under Section 6(a)(1)(A) and not Section 6(a)(1)(B), because defendants' conduct had no substantial effect on export trade with foreign nations.

[21]Statoil's complaint alleges that the defendants' conspiracy adversely affected at least $165 million in United States commerce during the 1993-97 period.

[22]Statoil repeatedly frames the inquiry as whether a plaintiff can suffer injury abroad, or whether the injury itself must be suffered in the United States. This approach is an incorrect formulation of the threshold question and reflects a misreading of the FTAIA. We recognize that many federal courts, including the district court in these proceedings, might have chosen to frame the analysis in this manner. However, the proper inquiry to make here is, regardless of the situs of the plaintiff's injury, did that injury arise from the anticompetitive effects on United States commerce? See, e.g., Caribbean, 148 F.3d 1080 (identifying that,

Based on the language of Section 2 of the FTAIA, the effect on United States commerce--in this case, the higher prices paid by United States companies for heavy-lift services in the Gulf of Mexico--must give rise to the claim that Statoil asserts against the defendants.  That is, Statoil's injury must stem from the effect of higher prices for heavy-lift services in the Gulf.  We find no evidence that this requirement is met here.  The higher prices American companies allegedly paid for services provided by the McDermott defendants in the Gulf of Mexico does not give rise to Statoil's claim that it paid inflated prices for HeereMac and Saipem's services in the North Sea.  This is not to say that any antitrust injury suffered by customers or competitors of McDermott that arose from the anticompetitive effect in the Gulf of Mexico cannot be addressed.[23]  This means only that, while we recognize that there may be a connection and an interrelatedness between the high prices paid for services in the Gulf of Mexico and the high prices paid in the North Sea, the FTAIA requires more than a "close

_____

while the situs of the injury was overseas, the claim arose from the conspiracy's effects on the United States advertising market).

[23]The dissent notes with disapproval that our interpretation of the FTAIA means that "a foreign cartel that fixes prices worldwide will be subject to suit under the Clayton Act only from plaintiffs injured in American commerce."  However, our reading produces the precise result intended by Congress--that "[f]oreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do."  H.R. Rep. No. 97-686, at 10-11.

17

relationship" between the domestic injury and the plaintiff's claim; it demands that the domestic effect "gives rise" to the claim.[24]

Statoil asks that we interpret the requirement of Section 2 that the domestic "<u>effect</u>" give rise to a claim under the antitrust laws as merely requiring that the defendants' domestic "<u>conduct</u>" (here, for example, agreements relating to the Gulf of Mexico) give rise to a claim. This interpretation is not true to the plain language of the FTAIA. Moreover, under such an expansive interpretation, any entities, anywhere, that were injured by any conduct that also had sufficient effect on United States commerce could flock to United States federal court for redress, even if

---

[24]Statoil argues that, had the district court accepted its allegation of a worldwide conspiracy as true, the requirements of the FTAIA would be satisfied and subject matter jurisdiction would exist. We cannot agree. Regardless of the nature of the conspiracy, Statoil must allege an injury that falls within the scope of the antitrust statutes. The assumed existence of a single, unified, global conspiracy does not relieve Statoil of its burden of alleging that its injury arose from the conspiracy's proscribed effects on United States commerce. This principle was stressed by the Supreme Court in <u>Matsushita</u>:

> Respondents also argue that the check prices, the five company rule, and the price fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. <u>However one decides to describe the contours of the asserted conspiracy--whether there is one conspiracy or several--respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief.</u>

475 U.S. at 584 n.7 (emphasis added).

18

those plaintiffs had no commercial relationship with any United States market and their injuries were unrelated to the injuries suffered in the United States.[25]  Such an expansive reading of the extraterritorial application of the antitrust laws was never intended nor contemplated by Congress.  See EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227 (1991) (noting that "[w]e assume that Congress legislates against the backdrop of the presumption against extraterritoriality.  Therefore, unless there is the affirmative intention of the Congress clearly expressed, we must presume it is primarily concerned with domestic conditions.") (citation omitted).

In sum, we find that the plain language of the FTAIA precludes subject matter jurisdiction over claims by foreign plaintiffs against defendants where the situs of the injury is overseas and that injury arises from effects in a non-domestic market.[26]

---

[25]The dissent repeatedly emphasizes that the antitrust laws have always contemplated foreign plaintiffs recovering for their injuries.  We do not disagree.  We simply read the FTAIA to provide that, if individuals conspire to restrain trade such that an American market is harmed, the United States antitrust laws can provide redress to any person injured by the domestic effects of the conspiracy, even if the injured party is located overseas.  See Sumitomo, 2000 WL 1521587, at *11 ("On the other hand, the antitrust laws do not apply to an action by a person injured overseas because of price-fixing in a foreign market even if the same defendants engage in price-fixing affecting an American market.").

[26]Statoil alleges that it paid inflated prices for heavy-lift services in the North Sea.  This injury, however, does not arise from the alleged effect on United States commerce--that is, the

19

Although the plain language of the relevant statutes is clear and controlling, we nonetheless turn now to address briefly the legislative history of the FTAIA to illustrate how that history reinforces our interpretation of the extraterritorial reach of the antitrust laws.

2

Before analyzing the legislative history of the FTAIA, we reemphasize that "[l]egislative history is relegated to a secondary source behind the language of the statute in determining congressional intent; even in its secondary role legislative history must be used cautiously." Boureslan v. Aramco, 857 F.2d 1014, 1018 (5th Cir. 1988) (citation omitted). We are thus "not free to substitute legislative history for the language of the Act." Id.

The FTAIA House Report states that the purpose of the law is "to more clearly establish when antitrust liability attaches to international business activities" and to ascertain "the precise legal standard to be employed in determining whether American

---

higher prices paid by United States consumers for heavy-lift services in the Gulf of Mexico. While Statoil also asserts that the conspiracy had the effect of raising crude oil prices in the United States, Statoil alleges no injuries to itself occurring in the market for crude oil or arising from this domestic effect.

antitrust law is to be applied to a particular transaction." H.R. Rep. No. 97-686, at 5, 8.[27] Moreover, the relevant House Report shows that Congress intended to exclude purely foreign transactions, like the contract for services in the North Sea between Statoil and the foreign defendants, from the reach of United States antitrust laws:

> A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. . . . It is thus clear that wholly foreign transactions as well as export transactions are covered by the [FTAIA], but that import transactions are not.

Id. at 10.

Thus, the legislative history of the FTAIA, while not controlling, reinforces our conclusion that a foreign plaintiff injured in a foreign marketplace must show that a substantial domestic effect on United States commerce "gives rise" to its antitrust claim.[28]

---

[27]The dissent seems to imply that the sole purpose of the FTAIA is to "exempt exporting from antitrust scrutiny." Although this is clearly a primary goal of the legislation, the dissent ignores the second purpose behind the FTAIA--to resolve "possible ambiguity" in the extraterritorial reach of antitrust jurisdiction. Id. at 4-5.

[28]The dissent argues that our decision in this case is contrary to the statement in the legislative history that "[a] course of conduct in the United States . . . would affect all purchasers of the target domestic products or services, whether the purchaser is

21

We now turn to address briefly applicable case law and its effect on our interpretation of the FTAIA.

3

Because few courts have directly addressed the specific meaning of the FTAIA's Section 2 requirement that a domestic effect "gives rise" to the plaintiff's antitrust claim, very little case law exists to aid our inquiry. Our interpretation of the FTAIA's requirements, however, is entirely consistent with prior case law defining the jurisdictional reach of the antitrust laws. Furthermore, those decisions illustrate that our interpretation of Section 2 is not a novel reading of the statute.

---

foreign or domestic." Again, we do not assert that foreign purchasers of domestic products can never sue in United States federal court. We only hold that the FTAIA requires that a foreign plaintiff show that its injuries arise from a United States market. This is not a novel reading of the FTAIA:

> [T]he legislative history [of the FTAIA] reflects that Congress was proceeding from the premise that, wherever title is taken or economic injury is suffered, at least some aspect of the sales transaction took place in the United States. Any doubt on that score is resolved by . . . the sentence which states that 'foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do.' Nothing is said about protecting foreign purchasers in foreign markets.

In re Microsoft Corp. Antitrust Litigation, 2001 U.S. Dist. LEXIS 305, at *37 (M.D. Md. Jan. 12, 2001).

22

To begin, we note that the only three federal courts that have addressed the narrow question before us interpreted Section 2 exactly as we have. See Kruman, et al. v. Christie's Int'l PLC, et al., 00 Civ. 6322 (S.D.N.Y. Jan. 29, 2001) (holding that the FTAIA permits jurisdiction "only where the conduct complained of had 'direct, substantial and reasonably foreseeable' effects in the United States and the effects giving rise to jurisdiction are the basis for the alleged injury."); In re Microsoft Corp., 2001 U.S. Dist. LEXIS 305, at *37 (holding that, under the FTAIA, "foreign consumers who have not participated in any way in the U.S. market have no right to institute a Sherman Act claim."); Sumitomo, 2000 WL 1521587, at *1 (holding that "it is plain from the language of this act and bolstered by the legislative history that a private plaintiff cannot sue under the antitrust laws of the United States for injuries incurred as a result of international transactions that have an anticompetitive effect on a United States market if the domestic anticompetitive effect is not the same one that gives rise to the plaintiff's injury.").

We further note that we have found no case in which jurisdiction was found in a case like this--where a foreign plaintiff is injured in a foreign market with no injuries arising

23

from the anticompetitive effect on a United States market.[29] In those cases where the domestic effect on commerce did not give rise to the plaintiff's claim, courts have found subject matter jurisdiction lacking. See, e.g., S. Megga Telecomm. Ltd. v. Lucent Technologies, Inc., 1997 WL 86413 (D.Del. Feb. 14, 1997) (anticompetitive domestic effect of higher prices for United States consumers did not "give rise" to plaintiff's claim for lost sales to defendant); The 'In' Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494 (M.D.N.C. 1987) (anticompetitive domestic effect (lost exports of United States exporters) did not "give rise" to plaintiff's claim for lost sales in France due to marketing sales agreement with defendant); de Atucha v. Commodity Exch., Inc., 608 F.Supp. 510 (S.D.N.Y. 1985) (conspiracy's effect on silver prices on United States exchange did not "give rise" to plaintiff's injury on London exchange).

On the other hand, in every case where jurisdiction has been found, the substantial effect on United States commerce has "give[n] rise" to the plaintiff's injury and claim under the

---

[29]See Sumitomo, 2000 WL 1521587, at *9 ("So far as can be determined, the issue [of interpreting the language of Section 2] never came up. In the reported cases, the courts had no occasion to address the same effects requirement because in each case, the plaintiffs' injuries arose out of the same effects experienced by the markets.").

antitrust laws.  See, e.g., Carpet Group Int'l v. Oriental Rug Importers Ass'n, 2000 WL 1273592 (3rd Cir. Sept. 8, 2000) (anticompetitive effect on domestic rug market 'gives rise' to plaintiff's injury); Caribbean, 148 F.3d 1080 (monopolization of United States market for advertising in the Caribbean "gives rise" to plaintiff's claim of being blocked from that market); Nippon Paper, 109 F.3d 1 (collusion amongst fax paper producers resulted in higher prices for fax paper in the United States, which "gives rise" to the United States' claim); Hartford Fire, 509 U.S. 764 (conspiracy's effect on the United States insurance market "gives rise" to the plaintiffs' injury, the inability to obtain certain types of coverage in that market).

Finally, we note that none of the cases cited by Statoil in support of its interpretation of the FTAIA cast doubt upon our plain language interpretation of Section 2.  Statoil cites Pfizer v. India, 434 U.S. 308, for the proposition that antitrust jurisdiction exists over foreign conduct like the commerce between Statoil and defendants in this case.  Pfizer, however, was decided four years before enactment of the FTAIA, and the court's holding was limited to the question of whether a foreign government

qualified as a "person" under the Sherman Act.  Id. at 320.[30]

Statoil further maintains that Caribbean Broadcasting, 148 F.3d

1080, requires that jurisdiction be found over its claims.

Initially, that case looks similar to today's case in that both the

plaintiff and the defendant were foreign, and the defendant's

international conspiracy had anticompetitive effects both inside

and outside the United States.  The critical difference, however,

is that the effect on United States commerce in that case (that is,

limiting to one radio station potential advertisers in the United

States who wished to advertise in the Eastern Caribbean radio

market) gave rise to the injury suffered by the plaintiff, a

competing radio station--that is, exclusion of the plaintiff from

the market for United States advertising dollars.  Id. at 1082,

1086.  As previously explained, that is simply not true with

Statoil's claims.[31]  Similarly, Statoil's reliance on Nippon Paper,

---

[30]The dissent relies heavily upon Pfizer in asserting that Statoil's claim should be cognizable in United States federal court.  The Pfizer court, however, did not analyze the requisite elements that must be present before a foreign entity can sue under the United States antitrust laws.  Indeed, Pfizer's narrow holding was "only that a foreign nation otherwise entitled to sue in our courts is entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff."  Id. (emphasis added).

[31]The dissent asserts that we "struggle" to reconcile Caribbean Broadcasting with our holding in the case before us.  However, the

109 F.3d 1, is misplaced because the global conspiracy in that case had the domestic effect of raising fax paper prices in the United States, which gave rise to the government's claim under the antitrust laws. <u>Id.</u> at 2.

Simply put, Statoil has cited no case law to support an interpretation of Section 2 of the FTAIA different from the one we now adopt. This absence of such precedent, when considered with the plain language of the statute and evidence of congressional intent in enacting the FTAIA, reinforces our conclusion in this case.

court in <u>Caribbean Broadcasting</u>, for whatever reason, completely ignored Section 2 of the FTAIA in its analysis. Given that a decision in the case before us requires an interpretation of that provision, we find <u>Caribbean Broadcasting</u> unhelpful to any resolution of Statoil's claim. Indeed, we fail to understand how <u>Caribbean Broadcasting</u> provides any meaningful support for the dissent's interpretation of Section 2, given that the plaintiff's claim in that case arose from the anticompetitive effects on the domestic market for radio advertising in the Caribbean. <u>See</u> 148 F.3d at 1086.

In sum, we find that the district court did not err when it dismissed Statoil's antitrust claims for lack of subject matter jurisdiction. Any reading of the FTAIA authorizing jurisdiction over Statoil's claims would open United States courts to global claims on a scale never intended by Congress. Without subject matter jurisdiction, United States federal courts are without power to entertain Statoil's claims.[32] The judgment of the district court is therefore

A F F I R M E D.

---

[32]As Statoil has no claim under the United States antitrust laws, we affirm the district court's finding that Statoil lacked standing to bring its claims. Based on <u>Associated Gen'l Contractors Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 535-45, 103 S.Ct. 897 (1983), the determination of Statoil's standing to bring its claims is dependent upon our finding of subject matter jurisdiction. Thus, in concluding that the FTAIA bars Statoil's claims against defendants under the Sherman Act, we have perforce found that Statoil's injury is not of the type that the antitrust statute was intended to forestall.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

I agree that this is not an easy case, but I have no hesitation in concluding that the Foreign Trade and Antitrust Improvements Act does not here divest the federal courts of jurisdiction and that the plaintiff has standing. With deference to my colleagues, I am persuaded by the plain text of section 6a, as well as its statutory context, legislative history, and purpose.

The claim is that defendants allocated the market for hundreds of millions of dollars of commerce – an allocation that placed United States markets at the mercy of monopoly charges in an industry vital to national security. The charged conspiracy was no foreign cabal whose secondary effects only lapped at United States shores. The impact of the conspiracy was direct and substantial. Indeed, the participation of American business in the market allocation scheme was critical to its success. The plaintiff here is a foreign company, true enough, but it was injured by the same acts of defendants that injured American plaintiffs whose right to seek recovery of their losses the district court recognized in this litigation.

29

With the Foreign Trade and Antitrust Improvements Act, Congress set out to insulate United States business from its antitrust laws for certain business conducted outside the country. Its central purpose was to assist American business in competing abroad. This pass from antitrust restrictions did not extend to all conduct outside the United States. It stopped short of insulating conduct having direct and substantial effects upon American commerce and causing antitrust injury to that commerce sufficient to support a claim for treble damages.

I am not persuaded that when illegal conduct produces these domestic effects, that Congress intended to close the door to a foreign company injured by the same illegal conduct. That was not the law before this effort to assist American business abroad, and Congress did not intend to change it or do so unwittingly. I would reverse and remand for further proceedings.

I

A

Interpretation of a statute must begin with the text of the statute itself. Section 6a states in its entirety:

Sections 1 to 7 of this title [the Sherman Act] shall not

apply to conduct involving trade or commerce (other than

30

import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect —

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

[Proviso:] If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this

title shall apply to such conduct only for injury to export business in the United States.[33]

Section 6a(1) requires an effect on (A) domestic or import commerce of the United States or (B) the export commerce of a person in the United States.[34]  Section 6a(2) requires that this effect "give[ ] rise to a claim under the provisions of sections 1 to 7 of this title, the Sherman Act, other than this section."  The majority reads section 6a(2) to require that the effect "give[ ] rise to" *the plaintiff's* claim.  It does not say that.  It does say that the effect must "give[ ] rise to *a* claim."[35]  In other words, the effect on United States commerce must be sufficient to support a claim, an injury of some person in a way cognizable under the Sherman Act.[36]

The literal text of the statute supports this conclusion.  It reads, "gives rise to a claim."  The word "a" has a simple and

---

[33] 15 U.S.C.A. § 6a (1997).

[34] For brevity, I herein refer to the effects required by section 6a(1) as effects on "United States commerce."

[35] 15 U.S.C. § 6a(2) (emphasis added).

[36] The effect must cause "antitrust injury."  The "effect" described by section 6a(1) can be beneficial, neutral, or injurious.  Section 6a(2) requires that this effect be injurious and, further, that the injury be caused by reduced, not increased, competition.

universally understood meaning.  It is the indefinite article.

There are many terms of art about which one can debate whether

Congress uses the term as courts do, but this word is not one of

them.  If the drafters of the FTAIA had wished to say "the claim"

instead of "a claim," they certainly would have.[37]

The reference to "a" claim makes clear that the "effect"

described by section 6a(1) must violate the Sherman Act — that is,

harm competition.  Section 6a(1) requires that the conspiracy have

an effect on United States commerce; section 6a(2) requires that

this effect either monopolize commerce or restrain trade in the

United States, thereby giving rise to a Sherman Act claim.  Section

6a(2) removes jurisdiction over conspiracies whose effects on

United States commerce are beneficial or benign, even if they

---

[37] Courts will not presume that statutory language is redundant
or surplusage.  The majority's interpretation, however, makes the
proviso at the end of section 6a redundant.  Section 6a(1)(B)
states that the Sherman Act applies to conduct with effects on
"export trade or export commerce with foreign nations, of a person
engaged in such trade or commerce in the United States."  The
proviso limits the applicability of the Sherman Act under section
6a(1)(B) "to such conduct only for injury to export business in the
United States."  Thus, while (1)(B) requires only that the conduct
affect a person engaged in export trade in the United States, the
proviso limits recovery under the Sherman Act to such persons.  The
majority's reading of 6a(2) renders this proviso redundant, since
it requires that the effect on the exporter in the United States
"give[ ] rise to" the plaintiff's claim — in other words, that the
person engaged in export trade be the plaintiff.

restrain competition in other parts of the world.  That an injury that "gives rise to" an antitrust claim must be an injury caused by harm to competition is no light notion.  It is a well established and fundamental tenet of antitrust law.[38]  Termed "antitrust injury," it is frequently encountered in enforcement action under the Clayton Act, by which Congress enlisted private enforcement in supplementation of governmental enforcement of the Sherman Act.[39]

Thus, the literal text does not require that the effect on United States commerce give rise to the plaintiff's claim.  At worst, the text is sufficiently ambiguous to allow for both the

[38] Courts have long held that private plaintiffs "must prove the existence of 'antitrust injury'" to recover under section 4 of the Clayton Act.  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Supreme Court noted that the plaintiffs "must show that the conspiracy caused them an injury for which the antitrust laws provide relief."  *Id.* at 584 n.7.  The Court explained that a "cognizable injury" is an "antitrust injury."  *Id.* at 586.

[39] The Clayton Act requires that *the plaintiff* suffer antitrust injury.  The FTAIA, by contrast, requires that the United States suffer antitrust injury.  *Compare* Clayton Act, 15 U.S.C.A. § 15(a) (providing cause of action to anyone "injured in *his* business or property by reason of anything forbidden in the antitrust laws") (emphasis added), *with* FTAIA, 15 U.S.C.A. § 6a(2) ("gives rise to *a* claim under the [Sherman Act]") (emphasis added).  When a private plaintiff wishes to sue under the Clayton Act, the Clayton Act and FTAIA erect complementary requirements: the plaintiff must suffer antitrust injury, and persons in United States commerce must suffer antitrust injury.  The majority opinion, on the other hand, appears to conflate these two concepts.

construction the majority offers and the construction I believe is correct. At the least, the majority cannot find support in a plain text argument.

Accepting that the text of the FTAIA compels neither the majority's reading or mine, we must enlist other aids in determining the meaning of the statute. In doing so, I conclude that the textual conclusion that "a" means "a" is supported by the statutory context of the FTAIA, which describes the function of the FTAIA and its animating purpose, and by the purposes of the antitrust laws in general; by the legislative history of the FTAIA; and by the sparse case law that interprets the FTAIA.

B

The FTAIA was enacted as Title IV of Public Law 97-290, entitled "Export Trading Company Act of 1982."[40] Title I contains the congressional findings. Every single congressional finding relates to the importance of export business and the need to encourage export activity by American business.[41] The statute then states: "It is the purpose of this Act to increase United States

---

[40] Export Trading Company Act of 1982, Pub. L. No. 97-290, 96 Stat. 1233 (codified in scattered sections of 15 U.S.C.).

[41] Export Trading Company Act of 1982 § 102, 96 Stat. at 1233-34.

exports of products and services by encouraging more efficient provision of export trade services to United States producers and suppliers, in particular by . . . modifying the application of the antitrust laws to certain export trade."[42]  It could not be clearer that the FTAIA serves to exempt exporting from antitrust scrutiny, not to limit the liability of participants in transnational conspiracies that affect United States commerce.[43]

---

[42] § 102(b), 96 Stat. at 1234.  The Third Circuit has recently cited this language in concluding that "Congress enacted the FTAIA for the purpose of facilitating the export of domestic goods by exempting export transactions that did not injure the United States economy from the Sherman Act and thereby relieving exporters from a competitive disadvantage in foreign trade."  *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 71 (3d Cir. 2000).

[43] Because the language of the statute is clear, we need not resort to its legislative history to discern its purpose.  In any case, the legislative history only reiterates this single, motivating purpose.  *See* H.R. Rep. No. 97-686, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 2487, 2487 (describing the legislation as "the bill . . . to exclude from the application of [the antitrust laws] certain conduct involving exports" and "one of several bills . . . that seek to promote American exports").  The excerpt of legislative history upon which the majority relies, that the purpose of the law is "to more clearly establish when antitrust liability attaches to international business activities," is certainly a true statement, but it expresses the purpose of the law at a level of generality that offers us no guidance on the narrow question we face.  What the majority has overlooked is that Congress has spoken with much more particularity as to the purpose of this law: the purpose of the FTAIA is to promote exports by exempting American exporting activity from the antitrust laws.

The text of the FTAIA implements this purpose perfectly. The Sherman Act, prior to the enactment of the FTAIA, applied to conduct that affected domestic, import, and export commerce. Recall that section 6a(1) limiting the reach of the Sherman Act applies to conduct that affects (1) domestic commerce; (2) import commerce; or (3) export commerce, but only to the extent that American exporters are affected. One class of conduct is excluded: conduct that affects only foreign purchasers of American exports. This is the function of the FTAIA: to protect American exporters who monopolize or conspire to restrain export trade that does not harm United States commerce.

The purpose of the FTAIA offers no support for the majority's reading of the statute. It is undisputed that if proved, the conspiracy in this case would have direct, substantial, and reasonably foreseeable effects upon United States commerce. No American exporters are implicated by this suit. American exporting business can only be harmed by the alleged conspiracy in this case.

Indeed, interpreting the FTAIA as the majority wishes will impair the competitiveness of American exporters. Under the majority's view, an American cartel that fixes prices worldwide will be subject to Clayton Act suits by plaintiffs from around the

world,[44] but a foreign cartel that fixes prices worldwide will be subject to suit under the Clayton Act only from plaintiffs injured in American commerce.  This interpretation of the FTAIA transforms a safe harbor for American exporters into a boon for foreign cartels that restrain commerce in the United States.

With respect to my colleagues, I fear that their reading of the FTAIA will hinder its purposes and reduce the effectiveness of the antitrust laws.  Nothing in the text of the FTAIA, or the Export Trading Company Act of 1982 as a whole, or its legislative history, casts doubt on the importance of deterring restraints of trade that affect United States commerce.  The Supreme Court has repeatedly recognized that the accent of the Sherman and the Clayton Acts is deterrence, requiring violators to pay full, treble damages, even if some plaintiffs gain a windfall or are foreigners. For example, in *Illinois Brick Co. v. Illinois*,[45] the Supreme Court noted the importance of "vigorous private enforcement of the antitrust laws" and "deterring violators" and recognized that "from

---

[44] This cannot seriously be disputed.  The FTAIA does not alter the holding of *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978), which allowed foreign governments to sue an American cartel that charged supra-competitive prices for pharmaceuticals worldwide. The legislative history approves of *Pfizer*. *See* H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.C.C.A.N. 2487, 2495.

[45] 431 U.S. 720 (1977).

the deterrence standpoint, it is irrelevant to whom damages are paid, so long as some one redresses the violation."[46]

The Supreme Court in *Pfizer, Inc. v. Government of India*[47] addressed a situation somewhat analogous to this case. The government of India sued several American pharmaceutical manufacturers under the Clayton Act for damages caused by a price-fixing conspiracy. Like Statoil, the government of India alleged a worldwide conspiracy that raised prices in the United States and abroad. Unlike in this case, in *Pfizer* the sales were made in the United States.[48] In holding that foreign governments could recover under the Clayton Act, Justice Stewart observed: "Treble-damage

---

[46] *Id.* at 745-46, *quoting id.* at 760 (Brennan, J., dissenting).

[47] 434 U.S. 308 (1978).

[48] Because of this, *Pfizer* is distinguishable from this case, since one can argue, as the majority does, that the injury to the foreign plaintiff occurred in the United States. But there is nothing in the reasoning of *Pfizer* that suggests that the facts of *Pfizer* define the outer limit of the antitrust laws. Further, even if we assume that the plaintiffs in *Pfizer* were injured in the United States, they were injured as buyers in an export transaction from the United States. Under section 6a(1)(B) and the majority's reading of the section 6a(2), injuries to buyers of American exports do not create jurisdiction under the antitrust laws. Yet the legislative history of the FTAIA cites *Pfizer* with approval. *Pfizer* maintains its force after the FTAIA because the conspiracy in *Pfizer* also affected Americans in domestic commerce. This is why section 6a(2) states "gives rise to a claim" and not "gives rise to the plaintiff's claim."

suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers. . . . [A]n exclusion of all foreign plaintiffs would lessen the deterrent effect of treble damages."[49]

The logic underlying this conclusion is straightforward. Conspirators facing antitrust liability only to plaintiffs injured by their conspiracy's effects on the United States may not be deterred from restraining trade in the United States. A worldwide price-fixing scheme could sustain monopoly prices in the United States even in the face of such liability if it could cross-subsidize its American operations with profits from abroad. Unless persons injured by the conspiracy's effects on foreign commerce could also bring antitrust suits against the conspiracy, the conspiracy could remain profitable and undeterred.

It is no rejoinder that conspirators would simply choose to exclude the United States from any price-fixing conspiracy as long as American plaintiffs could sue. In at least some cases, including the United States in a price-fixing conspiracy is necessary to generate monopoly profits. Otherwise, arbitrage would rapidly equalize unequal prices around the globe as speculators re-

---

[49] *Id.* at 314-15.

sold goods purchased in the United States to buyers in high-price regions.[50]  Thus, a cartel may find it impossible to fix prices anywhere without a worldwide conspiracy.  The Sherman Act can only deter these violations if it protects all parties injured by such a conspiracy.

Justice Stewart succinctly made this argument in *Pfizer*:

The conspiracy . . . operated domestically as well as internationally.  If foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home.  If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum

---

[50] For a real-life example of an arbitrage attempt, see *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102, 1104 (S.D. N.Y. 1984) (describing how antitrust plaintiff attempted to arbitrage pharmaceuticals by repackaging drugs purchased in England for sale in Germany).

deterrent effect of treble damages upon all potential violators.[51]

## C

The legislative history also supports this reading of the statute and undermines the majority's interpretation of section 6a(2).  The Committee Report on the House bill that became the FTAIA states that the FTAIA

does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States — *e.g.*, price fixing not limited to the export market — would affect all purchasers of the target domestic products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects in the United States, even if some purchasers take title abroad or suffer economic injury abroad.[52]

---

[51] 434 U.S. at 315 (footnote omitted).

[52] H.R. Rep. No. 97-686, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 2487, 2495 (emphasis in original), *citing Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978).

This statement explicitly refers to plaintiffs who "suffer economic injury abroad." The majority's interpretation of the statute is contrary to this statement in the legislative history. The "effect" on United States commerce is the injury suffered by purchasers in the United States; this effect does not give rise to the injury suffered by the foreign plaintiffs. Yet the legislative history contemplates such plaintiffs recovering under the Sherman Act. The scenario described in this statement is virtually identical to the instant case: a conspiracy sells to buyers in the United States and abroad, and each of the buyers is injured. All are injured by the same conspiracy, and it is a conspiracy that has been injurious to competition in the United States.

The majority, however, chooses to rely on the following statement in the same House Report:

> A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. . . . It is thus clear that wholly foreign transactions as well as export transactions are

43

covered by the [FTAIA], but that import transactions are not.[53]

That American ownership alone should not create jurisdiction over a wholly foreign conspiracy is not controverted, controversial, or relevant to this case.  What is relevant is that the language omitted from the quotation above states that if a conspiracy between two foreign firms, regardless of American ownership, does have an effect on domestic commerce, there is jurisdiction.[54]

D

I recognize that there is little precedent to guide our analysis of this question.  Of the case law that does exist, there are no appellate court cases supporting the majority's holding.  To the contrary, the majority must reconcile or distinguish the only other circuit court decisions interpreting the FTAIA, because all of them find jurisdiction present.

---

[53] *Id.* at 2494-95.

[54] *Id.* ("Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions — that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor.").

The majority opinion struggles, and I believe fails, to reconcile *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*,[55] which involved a foreign plaintiff alleging monopolization in radio advertising in the Caribbean by a competing radio station. The defendant was also a foreign entity. Consistent with the reasoning of this dissent, the D.C. Circuit held that the FTAIA did not preclude jurisdiction, because the plaintiff showed that the foreign defendants' conduct had the effect of harming United States purchasers of advertising. It stated: "the alleged injury is to advertisers in the United States."[56] Thus, based on the injury to advertisers in the United States, the court found jurisdiction over a suit by a radio broadcaster in the Caribbean. The D.C. Circuit did not require that the injury to American advertisers "give[ ] rise to" the plaintiff's cause of action; its determination that the injury gave rise to "a" claim was sufficient.

E

Finally, the majority's attempt to enlist the aid of the Commerce Clause and the canon of construction that creates a presumption against extraterritoriality is mistaken.

---

[55] 148 F.3d 1080 (D.C. Cir. 1998).

[56] *Id.* at 1086.

45

The majority suggests that the interpretation of the FTAIA that I espouse is beyond the power of Congress to regulate commerce.[57] The Supreme Court itself has recognized — in the context of the Sherman Act — that Congress has intended to regulate, and constitutionally has regulated, foreign conduct that affects United States commerce.[58] And it has been decades since any court has taken so cramped a view of the Commerce Clause in any context.[59]

The majority is correct to note that the courts' historical willingness to apply the Sherman Act extraterritorially is not dispositive of this appeal, since the FTAIA, and not the courts' earlier interpretations of the Sherman Act, is controlling here.[60] But precisely because the FTAIA applies here, the majority's reliance on the canon against extraterritorial application of statutes is misplaced. This canon operates when Congress has not

---

[57] *See* Majority Op. at 1938 n.18.

[58] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States.").

[59] *See, e.g., United States v. Lopez*, 514 U.S. 549, 552-59 (1995) (recounting the development of Commerce Clause jurisprudence in the domestic context).

[60] *See* Majority Op. at 1935-36.

clearly spoken on the issue of extraterritoriality.[61]  The FTAIA, however, explicitly addresses nothing other than extraterritoriality.  We must be careful not to use such a canon when Congress is speaking directly to the relevant issue.  Make no mistake: such canons reflect substantive presumptions about the content of laws.  If courts apply substantive canons of construction against statutes that do speak to an issue, then it is the courts, not Congress, who are making the policy choices that form the content of legislation.[62]

II

---

[61] *See E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("This 'canon of construction . . . is a valid approach whereby unexpressed congressional intent may be ascertained.' . . . In applying this rule of construction, we look to see whether 'language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage [extraterritorially].'").

[62] In any case, when Congress enacted the FTAIA, is was legislating against a backdrop of extraterritorial application of the Sherman Act; thus we cannot presume that Congress treated non-extraterritoriality as the default condition. *See Hartford Fire Ins.*, 509 U.S. at 796 ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."); *id.* at 814 (Scalia, J., dissenting) ("[I]t is now well established that the Sherman Act applies extraterritorially."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704 (1962).

Because I disagree with the majority's interpretation of the FTAIA, I would reach the standing inquiry. It is straightforward; this court has restated the test for standing under the Clayton Act as "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit."[63]

Statoil has standing. First, it has suffered injury-in-fact. It paid inflated prices directly to the defendants.

Second, Statoil has suffered antitrust injury. Antitrust injury requires that the injury to the plaintiff not merely show "injury causally linked to an illegal presence in the market" but injury "attributable to an anti-competitive aspect of the practice under scrutiny."[64] This element of standing excludes plaintiffs, primarily competitors, harmed by increased, rather than decreased,

---

[63] *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). For further discussion, see *McCormack v. NCAA*, 845 F.2d 1338, 1341 (5th Cir. 1988); *see also Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[64] *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990), *quoting Brunswick*, 429 U.S. at 489.

competition.[65]    Statoil's injury was the direct result of the alleged price-fixing conspiracy and consequent restraint of trade.[66]

Third and finally, Statoil is a proper plaintiff.  In determining whether a party is a proper plaintiff, it should examine "such factors as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment."[67]

First, neither Statoil's injuries, nor their connection to the defendants, is speculative.  The injuries arise from the defendants charging Statoil monopoly prices.  Second, other parties have not been harmed more directly than Statoil.  Statoil was a purchaser in the market for heavy-lift barge services, the market in which the defendants fixed prices.  Third, allowing Statoil to sue would not

---

[65] *See Atlantic Richfield*, 495 U.S. at 334, 337-38; *Brunswick*, 429 U.S. at 488-89.

[66] Appellees rely heavily on the antitrust injury requirement in arguing that Statoil lacks standing.  Their argument that Statoil's injury was not caused by high prices charged to U.S. consumers misconstrues the antitrust injury requirement. Antitrust injury does not limit standing to U.S. consumers but to anti-competitive injuries. *See Doctor's Hospital*, 123 F.3d at 305-06; *see also Blue Shield of Virginia v. McReady*, 457 U.S. 465 (1982).

[67] *McCormack*, 845 F.2d at 1341.

risk duplicative recoveries or the like.  There is no suggestion that any unnamed party can seek to recover for the same damages Statoil suffered.

III

The antitrust laws have always given federal courts jurisdiction over conspiracies that adversely affect competition in the United States.  The FTAIA limits that jurisdiction; but it does so by exempting American export conspiracies, not foreign conspiracies that injure American competition.

The majority opinion expresses concern that foreign litigants will flock to the United States for redress of their injuries in distant lands.  The majority opinion, and the district court opinions it cites, seem to fear that the interpretation of the FTAIA that Statoil advocates makes the Sherman Act an antitrust regulation of foreign economies throughout the entire world, a paternalistic lawmaking enterprise that ignores the adequacy of foreign tribunals.  But Congress has enacted no such thing. Congress enacted the FTAIA to serve the United States' narrow interest in vigorous domestic competition.

The text of the FTAIA may be inelegant, but it serves the selfish national interests of the United States: the FTAIA excludes from antitrust liability all conduct that has caused no antitrust

50

injury to the United States economy;[68] but it enlists all injured parties — foreign or domestic — to assist the Department of Justice in deterring conduct that does harm the forces of competition in the United States. When a conspiracy causes a direct and substantial injury to competition in the United States, the Clayton Act recruits private parties to supplement the efforts of the Department of Justice in ending the conspiracy. The FTAIA ensures that parties injured by foreign aspects of the same conspiracy that harms American commerce are part of the phalanx of enforcers brought to bear by the Clayton Act. Thus, treble damages suits by parties who suffer antitrust injury from a conspiracy that has a direct and substantial harmful impact on United States commerce serve a single function: the protection of United States commerce. The FTAIA threatens no parade of horribles — it does nothing more than zealously protect competition in the United States while sparing from the docket of American courts suits involving conspiracies that affect only foreign economies.

In sum, I believe the FTAIA does not divest the federal courts of jurisdiction over suits by plaintiffs who suffer antitrust

---

[68] Indeed, the fact that the FTAIA protects American exporters from antitrust liability for conduct that restrains export trade indicates that the FTAIA is not concerned with regulating foreign economies.

injuries from a conspiracy that also harms competition in United States commerce. Whether the harm felt in the United States is the source of the injury to the plaintiff is irrelevant; it is the effects on the United States that creates jurisdiction. Under the facts of this case, I would conclude that the district court had jurisdiction over the suit and that Statoil had standing to sue the defendants under the Clayton Act. I respectfully dissent.